UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON

CRIMINAL ACTION NO. 2:07-cr-74-DLB

UNITED STATES OF AMERICA,                                                          PLAINTIFF,

V.                                    **MAGISTRATE JUDGE'S REPORT
                                       AND RECOMMENDATION**

JOHN A. ROBINSON,                                                                  DEFENDANT.

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant John A. Robinson's, ("Robinson"), *pro se*

Motion to Vacate, Set Aside, or Correct his sentence under 28 U.S.C. § 2255. [Record No. 112].

Consistent with local practice, the matter has been referred to the undersigned for preparation of

a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Having been fully briefed,

and for the reasons discussed below, it is recommended that Robinson's motion be denied.

I. FACTUAL & PROCEDURAL HISTORY

The following factual and procedural summary is taken from the Sixth Circuit's opinion

rendered following Robinson's direct appeal.

> On September 10, 2007, at about 2:00 a.m., the alarm at the Fifth Third Bank located near Erlanger, Kentucky was triggered. When Elsmere Police Officer Steve Dickerson arrived at the bank, he observed a person wearing dark clothing and white shoes and gloves run into a grassy field behind the bank. Dickerson pursued the suspect but lost contact in the darkness as the suspect reached the woods next to the field. Dickerson called for assistance from a canine unit. Boone County Sheriff Deputy Jeff Ruber responded with his police dog. After an hour of searching the woods and area around a nearby apartment complex, nothing had been turned up.

> At about 3:47 a.m., Erlanger Police Officer Dave Lillich showed up with his German shepherd police dog, Sombie. Sombie discovered several bags of tools in the knee-high grass of the grassy field. Among the tools were a drill,

screwdrivers, pliers, duct tape, wooden dowel rods (with hooks taped to the ends), hand-held grinder, extension cord, and a hydraulic "porta-power" tool.

At about 4:15 a.m., a resident of the neighboring apartment complex, Eugene Harris, advised the police that he had, from his balcony, observed a suspicious looking man in the parking lot. Harris said that when he asked the man what he was doing, he answered, "this is my car." He then got into and drove off in what Harris described as a large dark car-a Ford or a Continental. Acting on the tip, Officer Lillich and Deputy Ruber found a black Lincoln Continental parked near Harris's condominium. It was unoccupied. As Sombie searched around the area, he alerted at a fenced-in trash collection area. Lillich ordered anyone inside to come out. As soon as Sombie entered the fenced-in area, a man jumped out and took off running. With Sombie's help, the officers managed to apprehend the suspect, who turned out to be defendant John Robinson.

The officers searched the area where Robinson had been hiding and found dark clothing, white gym shoes, tan gloves, a flashlight and a ski mask. Inside the Lincoln, owned by Robinson's foster brother, the officers found mail bearing Robinson's name, road atlases and maps, a card bearing the name and number of a locksmith, driving directions to various Fifth Third Bank locations, a bank deposit bag containing seven $100 bills, dowel rods (with fish hooks) and bags (like those found in the grassy field) containing "porta-powers," extension cords, sledgehammers, bolt cutters, pry bar, long rods, hammers, black electrical tape, a stethoscope for tools, and a snake-type device.

Investigation at the bank revealed that the night deposit box lock had been drilled and the plastic or fiberglass covering of the box had been ground or drilled, creating white dust. Duct tape was also found at the night deposit box. After Robinson was arrested and advised of his rights, he declined to make a statement to the police.

Robinson was subsequently charged by indictment in the Eastern District of Kentucky with a single count of attempting to enter a bank with intent to commit a felony, in violation of 18 U.S.C. § 2113(a). Attorney Gary Sergent was appointed to represent Robinson. Robinson moved to suppress evidence found in the Lincoln. The motion was denied and the ruling has not been appealed. On February 7, 2008, the district court granted Robinson's motion to permit withdrawal of counsel, based on "professional differences." Attorney F. Dennis Alerding was appointed. On February 20, Robinson, acting *pro se*, and observing that Alerding seemed to be too busy to properly prepare for Robinson's upcoming trial date, requested the court consider appointing another attorney. The request was inserted in Robinson's *pro se* motion for a bill of particulars and discovery. The district court rejected the motions, noting that Robinson was represented by an experienced member of the federal public defender panel, and directed the Clerk to disregard any further *pro se* submissions by Robinson.

As trial commenced on March 3, Robinson did not renew his request for appointment of new counsel or otherwise express dissatisfaction with Alerding's representation. The jury trial lasted three days. After the prosecution presented proofs consistent with the above summary of the police officers' findings in the vicinity of the Fifth Third Bank on September 10, 2007, defendant Robinson testified, offering an innocent explanation for his presence and unusual behavior in Erlanger.

Robinson testified that he was a resident of Jeffersontown, Kentucky, just outside Louisville. He was the owner of a small trucking company and earned extra money by repairing others' trucks and by buying cars at auction, fixing them and reselling them. This explained his possession of numerous tools.

On the evening of September 9, 2007, Robinson explained, he received a call from a man whose semi-truck had broken down at a rest stop in northern Kentucky. He agreed to drive there for $50 and charged $50/hour to work on the truck. On the way to the rest stop in a black Lincoln, Robinson dropped off an acquaintance, Hector Gonzales, at an apartment complex in Erlanger (approximately 80 miles northeast of Jeffersontown), which happened to be near a Fifth Third Bank. Gonzales took bags of tools with him, saying he needed a couple of hours. Robinson proceeded to the rest stop, where he found the semi-truck and repaired it.

He testified that he also assisted another motorist at the rest stop with her Toyota Celica. In fact, in the early morning hours of September 10, he sought out a nearby auto parts store (a 24-hour AutoZone store) to buy a replacement distributor cap. He produced a receipt showing that the purchase had been made at 1:37 a.m. Robinson believed it was about 3:00 a.m. when he returned to the rest stop and replaced the Toyota distributor cap.

He then returned to Erlanger to pick up Gonzales. As he approached the apartment complex, he noticed police in the adjacent field. Because Gonzales was not waiting where Robinson had dropped him off the previous evening, Robinson parked his car and walked around the parking lot to make himself visible. After a brief exchange with an apartment resident, who asked what he was doing, Robinson got back in his car and began to drive off. He parked again to secure the hood of the car when he realized it was unlatched. As he was about to re-enter the car, Robinson noticed a police officer approaching. Rather than risk a confrontation with the police, Robinson decided to hide behind a fence.

Robinson had an explanation for this rather unusual behavior, too. He testified that he had been pulled over by the police near Louisville at about 3:00 a.m. one morning a few weeks earlier. What began on that occasion as a routine traffic stop became something of a traumatic event. Robinson was ordered to get out of his car and get down on the ground. He was handcuffed and placed in a patrol car for a few minutes before the officers realized he was not the "John Robinson" who

3

was wanted on a warrant for murder in Florida. It was because of this earlier case of mistaken identity that Robinson said he wanted to avoid another encounter with the police.

So, when the officers approached the fenced-in area where he was hiding, he decided to take off and run. He admitted this was "stupid." He ran for a couple of minutes before he was caught and arrested.

On cross-examination, Robinson admitted he had been previously convicted, in 1995, of money laundering, causing transportation of stolen vehicles, and failing to file timely tax returns. He had been sentenced to a prison term of 162 months for these offenses and was still subject to post-release supervision on September 10, 2007.  He further acknowledged that by leaving the Western District of Kentucky and traveling to the rest stop in northern Kentucky without his supervising probation officer's express permission, he had violated a condition of his supervised release. Robinson explained that since the need to drive to northern Kentucky had come up unexpectedly on a Sunday evening, he planned to advise his probation officer the next day.

After about three hours of deliberation, the jury reached its verdict, finding defendant Robinson guilty as charged of attempted bank burglary. Shortly thereafter, Robinson's attorney, Dennis Alerding, was allowed to withdraw and new counsel, Derek Gordon, was appointed. On July 22, 2008, the district court sentenced Robinson to a 72-month term of imprisonment, followed by three years of supervised release.

Shortly after filing his notice of appeal, Robinson sought and obtained substitution of appointed counsel, replacing Gordon with David Mills.

United States v. Robinson, 357 Fed.Appx. 677, 678-81 (6th Cir. 2009).  The Sixth Circuit affirmed his conviction and sentence. Id. at 690-91.

On November 8, 2011, Robinson filed the instant Motion to Vacate, Set Aside, or Correct his Sentence under 28 U.S.C. § 2255. [Record No. 112].  In his motion, Robinson claims that he was convicted due to his attorneys' incompetent representation prior to and during trial in violation of his Sixth Amendment right to effective assistance of counsel.  [Record No. 112 at 4-7; see also Record No. 152].  Robinson was represented at trial by Dennis Alerding, ("Alerding"), after moving to have his first attorney removed and new counsel appointed. Robinson raises ten (10) main claims of ineffective assistance of counsel, as follows: (1) pre-trial

4

and trial counsels' failure to pursue Fourth Amendment violations related to seizure of his vehicle, the sufficiency of the warrant to search his vehicle, and his arrest; (2) failure to conduct a reasonable investigation prior to trial; (3) failure to adequately cross-examine the prosecution's witnesses, Officer Steve Dickerson, Deputy Jeff Ruber, and Detective Greg Aylor; (4) failure to object to prosecutorial misconduct, including  references to Robinson's invocation of his right to remain silent, improper vouching for Government witnesses, improper cross-examination of Robinson and references to his testimony, and inappropriate testimonial statements made by the prosecutor; (5) failure to admit into evidence a receipt from Auto Zone; (6) failure to pursue admission of evidence of a dog bite over the trial judge's exclusion of such evidence; (7) failure to object to improperly admitted, highly prejudicial demonstrative evidence, including a letter from Fifth-Third Bank denying Robinson a line of credit and monthly supervision reports from his probation officer; (8) deficient closing argument; (9) failure to object to instances of judicial misconduct; and (10) alleged collusion with the prosecution to obtain Robinson's conviction. [Record Nos. 112 & 152].  Robinson argues that these errors each individually merit the vacation of his sentence or, even if any single instance does not merit relief, the cumulative effect of counsels' numerous serious errors undermined the trustworthiness of the trial and verdict of conviction.  [Record No. 152 at 88-89].  However, for the reasons that follow, the Court will recommend that Robinson's motion for habeas relief be denied.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255 to successfully challenge conviction, a movant must establish either an error of constitutional magnitude which had a substantial injurious influence on the proceedings or a mistake of fact or law that was so fundamental as to result "in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process."

Walton v. United States, 165 F.3d 486, 488 (6th Cir. 1999) (internal citations and quotation omitted).

In addressing ineffective assistance of counsel claims, the Supreme Court has elaborated on the standard of review under 28 U.S.C. § 2255. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). To meet this standard, the Court set forth a two part test that a defendant must satisfy by a preponderance of the evidence. First, defendants are required to show that their representation fell "below an objective standard of reasonableness." Id. at 687-88. This standard is very deferential, with a "strong presumption that counsel's conduct 'falls within a wide range of reasonable professional assistance.'" Cope v. United States, 272 Fed.Appx. 445, 448 (6th Cir. 2008) (quoting Mason v. Mitchell, 320 F.3d 604, 616-17 (6th Cir. 2003)). If a defendant is able to satisfy the first prong, the inadequacy of counsel's performance must be shown to have prejudiced the defendant. In order to demonstrate prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Additionally, "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." Walker v. Engle, 703 F.2d 959, 963 (6th Cir. 1983) (citations omitted). If the defendant can establish a reasonable probability that a different outcome would have resulted absent the cumulative effect of all of counsel's unprofessional errors, "the result of a particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Strickland, 466 U.S. at 696; see also Walker, 703 F.2d at 963.

Accordingly, if a defendant meets both prongs of the test, deficient representation and actual prejudice, the defendant's sentence must be vacated or set aside.

III. ANALYSIS

A.  ROBINSON'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

**1.  Failure to Adequately Litigate Fourth Amendment Claims**

Robinson brings two claims of alleged ineffective assistance of counsel relating to the incomplete litigation of Fourth Amendment claims.   First, he claims that his counsel was ineffective for failing to argue that the seizure of his vehicle and the warrant authorizing its search violated his rights under the Fourth Amendment.   Second, that counsel was ineffective for failing to challenge his arrest.   However, for the reasons stated below, these claims provide Robinson no relief in this action.

*a.  The Search and Seizure of Robinson's Vehicle*

Robinson first alleges that counsel was ineffective by failing to raise potential issues with the seizure of his vehicle and the sufficiency of the warrant authorizing its search. [Record No. 152, at 6-10, 22-39].   However, because Robinson lacked standing to challenge either, these claims are without merit. Standing under the Fourth Amendment is determined by "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Rakas v. Illinois, 439 U.S. 128, 140 (1978).   In order to have standing to challenge the search and seizure of a vehicle, a defendant must show "that he personally had an expectation of privacy in the [vehicle] that society is prepared to consider reasonable." United States v. Elmore, 304 F.3d 557, 561 (6th Cir. 2002). Under KENTUCKY REVISED STATUTE § 186A.065, a vehicle owner is required to apply for a certificate of title in his name before he may operate it on the Kentucky highways. KY. REV. STAT. § 186A.065.The Sixth

7

Circuit has found that a claim that "the purchase money had been [the defendant's], and an expectation that at some time in the future, [the previous owner] would transfer title of the car to him" is not sufficient to give someone a proprietary or possessory interest in the vehicle. Elmore, 304 F.3d at 562.

Robinson failed for eleven (11) months to apply for title in his name. Other than his claim that he paid for the car and his use of it the night of the burglary, there was little evidence to show a legitimate expectation of privacy in the vehicle itself. Therefore, without an ownership interest in the vehicle, Robinson had no expectation of privacy and lacked standing to bring Fourth Amendment claims below. Accordingly, counsels' failure to challenge the vehicle search and the sufficiency of the warrant authorizing the search were not unreasonable, as Robinson lacked standing.

   *b. Robinson's Arrest*

Robinson next claims that his attorneys were ineffective for failing to challenge his arrest. He argues that his allegedly unlawful arrest or seizure occurred when, without probable cause to detain him, the police officers blocked his unoccupied car from leaving its parking space. [Record No. 152, at 10-22]. In the alternative, he contends that, although he fled when officers approached the trash collection area where he was hiding and ordered him to come out, he was seized at that time in violation of his Fourth Amendment rights. [Record No. 152, at 14]. However, it is clear that Robinson was not under arrest and Fourth Amendment rights in his person were not triggered until he was actually apprehended by law enforcement. California v. Hodari D., 499 U.S. 621, 625-29 (1991). In California v. Hodari D., the Supreme Court held that the mere show of authority, without submission to such authority, is not sufficient to constitute the arrest or seizure of a person. Id. at 629. While Robinson does point out the potential heavy

show of authority by the police prior to his arrest, because Robinson attempted to flee, this was not enough to constitute his seizure.  Therefore, Robinson's counsel did not have meritorious grounds to challenge his arrest when officers blocked the vehicle he had been driving, or ordered him to come into the open, and Robinson was not denied effective assistance of counsel.

### 2.   Failure to Conduct an Adequate Pretrial Investigation

Robinson alleges that his trial counsel failed to adequately investigate the government's evidence, and potentially favorable evidence prior to trial. [Record No. 152, at 40-45]. Specifically, according to Robinson, his counsel failed to call as a witness Al Tanner, a locksmith.  During the vehicle search in this case, law enforcement recovered a card with Tanner's name. Robinson claims that counsel should have called Tanner to refute the government's theory that he taught Robinson how to break into the bank deposit box. [Record No. 152, at 40-43].  Robinson additionally claims that counsel failed in his pretrial investigation in that counsel did not read transcripts from an earlier suppression hearing, which contained testimony of Officer Dickerson necessary to impeach other law enforcement officers at trial. [Record No. 152, at 43-45].

In conducting any pretrial investigation, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. 668, 690-91 (1984).  In evaluating a claim of insufficient investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead . . . reasonable attorney[s] to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003).  Additionally, "[t]he relevant

9

inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998) quoted in Brown v. United States, NO. 1:03-cv-90/1:99-CR-89, 2006 U.S. Dist. LEXIS 23973, at *12 (E.D. Tenn. March 20, 2006); *see also* Janosky v. St. Amand, 594 F.3d 39, 49 (1st Cir. 2010). Strickland makes clear that any decision made by an attorney to investigate or to refrain from investigating particular facts and circumstances must be evaluated for its reasonableness "viewed as of *the time of counsel's conduct*." Strickland v. Washington, 466 U.S. 668, 690 (1984) (emphasis added). Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id., at 691. In light of the record and the applicable standard, the Court is led to find that Robinson's claims are without merit.

a. *Failure to Call Al Tanner as a Witness*

In considering Robinson's claim that counsel was ineffective for failing to call Al Tanner as a witness, the Court is instructed by a case from the Eleventh Circuit, which described the level of deference due to counsel when deciding what witnesses to call at trial:

> That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. . . . The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.

Walters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (citations, internal quotation marks, and alterations omitted), quoted in Grossman v. McDonough, 466 F.3d 1325, 1347 (11th Cir. 2006); *see also* Urban v. Ohio Adult Parole Auth., 116 Fed. Appx. 617, 623 (6th Cir. 2004) ("[T]he

failure to call witnesses does not automatically establish ineffectiveness . . . [i]n the absence of any demonstration of prejudice . . . .").

Although Robinson asserts that he told Alerding about his desire to call Al Tanner as a witness to refute the government's theory that he taught Robinson how to break into the night deposit box, the record before the Court does not reflect such a theory by the government at trial. [*See* Record Nos. 133-2, ¶ 2 & 152, at 41] A card with Tanner's name on it was referenced by the prosecutor during opening as one of the items recovered in the vehicle search, and admitted into evidence during direct examination of Greg Aylor. [Record Nos. 91, at 129; 92, at 244]. However, contrary to Robinson's assertion, there is no indication in the record that the government claimed Tanner taught Robinson how to break into a night deposit box.  This being the case, the Court cannot find reason to believe that counsel's decision not to call Tanner as a witness was unreasonable. Simply, although he might have been called as a witness, Robinson cannot establish prejudice resulting from a lack of Tanner's testimony about a theory the government did not espouse. Therefore, counsel's decision not to call Mr. Tanner as a witness was not deficient representation.

### b.  *Failure to Present Impeachment Evidence from Suppression Hearing Transcripts*

Robinson next maintains that counsel failed to read the transcripts from an earlier suppression hearing, which contained testimony of Officer Dickerson.  This testimony, according to Robinson, contradicted testimony offered at trial and would have been useful for impeachment. [Record No. 152, at 44-45].  After the burglary, law enforcement set up a perimeter around the Fifth-Third Bank and condominium complex where Robinson was found. At trial, officers testified that Robinson could not have driven into the condominium complex area after 3:00 a.m. due to the existence of the perimeter.  However, Robinson alleges that at the

earlier suppression hearing, Officer Dickerson testified that the perimeter was not set up until almost 4:00 a.m., and then the officers were only checking cars leaving, not those coming into the area. [Record No. 152, at 44]. Robinson claims that this would support his argument that he drove to the condominium complex after 3:00 a.m., and subsequent to the burglary attempt, which law enforcement testified was not possible due to the perimeter. [Record No. 152, at 44-45].

First, as Officer Dickerson did not participate in setting up the perimeter and only testified at the suppression hearing as to when and how he thought the perimeter was set up while he was searching the area of the bank, his testimony would not have held much weight to discredit the officers that had personal knowledge of when and how the perimeter was set up. Second, as Officer Dickerson did not testify about the details of the perimeter at trial, his testimony would have been inadmissible hearsay and otherwise inadmissible extrinsic impeachment evidence under the "collateral issue rule." *See, e.g.*, United States v. Catalan-Roman, 585 F.3d 453, 468-69 (1st Cir. 2009) ("A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the court testimony of the witness." (internal quotation marks omitted)); United States v. Grooms, 978 F.2d 425, 428 (8th Cir. 1992) ("[A] witness may not be impeached on a collateral matter by the use of extrinsic evidence."); United States v. Meeks, Case No: 10-20123, 2012 U.S. Dist. LEXIS 31708, at *3-6 (E.D. Mich. Mar. 9, 2012); 4-607 WEINSTEIN'S FED. EVID. § 607.02[1] (2012). Accordingly, the fact that Alerding did not present evidence of Officer Dickerson's testimony does not merit the conclusion that he failed to perform an adequate investigation. Robinson's allegation lacks any legitimate claim that Alerding actually failed to read the transcripts, and considering the subject matter of the

suppression hearing, any failure to read the previous testimony was not unreasonable. Therefore, Robinson's claim of deficient representation is erroneous in regard to the failure to present the suppression hearing testimony.

### 3. Failure to Competently and Adequately Cross-Examine Government Witnesses

Robinson claims that his right to effective assistance of counsel was denied by Alerding's cross-examination of government witnesses. [Record 152, at 46-51]. Robinson claims that "Alerding's cross-examination shares for [sic] more in common with a prosecutor's direct-examination than with a criminal defense attorney's cross-examination. Indeed counsel's cross-examination which involved eliciting testimony that he know [sic] to be false, was so outrageous that it would have rightly subjected a prosecutor to charges of misconduct." [Record No. 152, at 46]. This claim is subject to the deferential Strickland standard, as there is no allegation of an entire failure of counsel "to subject the prosecution's case to meaningful adversarial testing[.]" United States v. Cronic, 466 U.S. 648, 659 (1984); Bell v. Cone, 535 U.S. 685, 695-98 (2002). In reference to the substance of cross-examination,

> [w]here, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. Simply put, impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available.

Millender v. Adams, 187 F.Supp.2d 852, 872 (E.D. Mich. 2002), aff'd, 376 F.3d 520 (6th Cir. 2004).

While Robinson points out isolated instances of questionable phrasing, it is clear that the record as a whole reflects Alerding's meaningful and thorough cross-examination of government witnesses. Additionally, besides a few instances of arguably poor word choice, Alerding's

13

questioning clearly indicated a sound trial strategy, "and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." Id. As the record clearly conveys the competent and meaningful exposure of the government's case to adversarial testing, Alerding's cross-examination did not constitute ineffective assistance of counsel.

### 4. Admission of Evidence

Robinson brings several claims of ineffective assistance of counsel relating to the admission of demonstrative and documentary evidence.  The three issues include the Court's refusal to let Robinson show the jury scars on his back from dog bites, the failure to admit into evidence an AutoZone receipt, and the failure to object to unadmitted government documents being let into the jury room for consideration.

### a. Failure to Object to the Exclusion of the "Dog Bite" Evidence

Robinson alleges that counsel was ineffective for failing to object when the Court prohibited him from showing the jury scars on his back. He contends that the scars were evidence that would have corroborated his story that the officers ordered the dog to bite him after he was already lying on the ground, impeaching the government's witnesses. [Record No. 159, at 63-64].  He also alleges that counsel was deficient for failing to lay a proper foundation for admitting the scars. [Record No. 159, at 63-64]. However, under FEDERAL RULE OF EVIDENCE 103, in order to preserve a claim of error when a ruling excludes evidence, an objection is not necessary. FED. R. EVID. 103(a)(2). A party only needs to make an offer of proof of the substance of the evidence unless the substance of the excluded evidence is apparent from the context. Id. Further, "[o]nce the court rules definitively on the record . . . a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Id. (b). Therefore, if the court excludes

evidence, the party seeking to admit the evidence does not need to object to the court's ruling in order to preserve the issue for appeal.

When the Court prohibited Robinson from showing the jury the scars on his back, the Court made a definitive ruling to exclude the evidence. No objection or offer of proof  to the Court's ruling was necessary to preserve a claim of error. Further, the circumstances  show that the exclusion was not based on the failure to lay a proper foundation. Accordingly, Alerding was not deficient for failing to object or lay a proper foundation in relation to the dog bite evidence or for failing to challenge the Court's ruling.

   b.  *Failure to Admit into Evidence the AutoZone Receipt*

Robinson claims that the AutoZone receipt, which corroborated his testimony, was not properly admitted into evidence by his attorney and therefore was not sent back with the jury during deliberations. [Record No. 152, at 59-63].  His claim is based on the court reporter's description of the defense exhibits, which indicates that they are all photos.  [Record No. 152, at 60; Record No. 98, at 367.11-12].  However, the Court refers Robinson to the second to last entry on page three (3) of the clerk's witness and exhibit list taken during trial. [Record No. 59]. This record clearly indicates that a photocopy of the AutoZone receipt was admitted as Defense exhibit 2. [Record No. 59, at 3].  Therefore, Robinson's argument that his attorney never properly admitted the AutoZone receipt is erroneous and his right to effective assistance of counsel was not violated.

   c.  *Failure to Object to Unadmitted Documents Being allowed in the Jury Room During Deliberation*

Robinson claims that defense counsel failed to object to documents being sent into the jury room that were not admitted into evidence at trial. [Record No. 152, at 71-72].  The documents complained of include mail and other papers that were in a black satchel (also

referred to as a briefcase) found in the car Robinson was driving when he was arrested. [Record No. 152, at 72].  However, the documents Robinson alleges were improperly allowed to be considered by the jury were admitted into evidence during trial. [*See, e.g.*, Record No. 59, at 3]. The clerk's exhibit and witness list shows that the black satchel was admitted into evidence, along with all the documents contained therein. [Record No. 59, at 3].  Therefore, counsel had no grounds to object to the documents being considered by the jury during deliberations. Accordingly, it was not deficient assistance of counsel to refrain from objecting to the documents being allowed in the jury room.

### 5.   Failure to Object to Judicial Misconduct and Counsel's Conflict of Interest

Two of Robinson's claims raised in his petition were not addressed in his reply.  First, Robinson alleges that the trial judge made hostile remarks about him in front of the jury to which Alerding failed to object. [Record No. 112, at 7]. Second, he asserts that Alerding's conduct "conflicted between his client's interests and the prosecution's position." [Record No. 112, at 7]. Both grounds lack sufficient factual support to conclude that they were instances of deficient representation.  Robinson does not point to any specific remarks constituting objectionable judicial misconduct or conduct by Alerding that would support any inference of a conflict of interest.  Therefore, the Court finds both of these grounds without merit and not instances of deficient representation.

### 6.   Failure to Object to Prosecutorial Misconduct

#### a.  *Improper Testimonial Statements by the Prosecution*

Robinson alleges that during his cross-examination, the government improperly made testimonial statements about the distance between the twenty-four (24) hour AutoZone and the Fifth-Third Bank where the night deposit box that was burglarized is located. [*See* Record No.

16

152, at 57]. On cross-examination, the AUSA posed the following questions to Robinson: "Are you aware, even though you're not from this area, that the Auto Zone you went to is not that far of a distance from the Fifth Third Bank on Dixie Highway in Erlanger, Kentucky?" and "If I were to tell you I'm from this area, and it's not so far, would you have any reason to dispute that?". [Record No. 92, at 339.10-12 & 14-15]. Robinson claims that there was no evidence to support the prosecution's conclusions concerning the distance in the questions and the allusions to the distance between the two locations violated his right of confrontation. [*See* Record No. 152, at 156-158].   Robinson further alleges that Alerding's failure to object to the line of questioning regarding the distance between the two locations was an error which resulted in inadequate assistance of counsel.  [*See* Record No. 152, at 156-158].

"Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." FED. R. EVID. 611(b).  The line of questioning regarding the distance between the AutoZone and the Fifth-Third Bank was not improper. Robinson's direct examination covered his whereabouts on the night of the burglary, including the receipt from AutoZone, placing him on U.S. 42 in Florence twenty-three (23) minutes before the alarm was tripped at the Fifth-Third.  [*See, e.g.*, Record No. 92, at 314.16-315.23].  While Robinson testified that he did not drive directly from the AutoZone to the Fifth-Third, the evidence in the record from the prosecution's case in chief suggested that he was at the Fifth-Third when the alarm was tripped.  On cross-examination, the government was allowed to question him about his version of events that night, including that while the receipt placed him in Florence shortly before the burglary, it did not conclusively show that he could not have been the person who tripped the alarm and burglarized the deposit box.  Additionally, the line of questioning was a proper means to challenge the truth of the rest Robinson's version of events,

17

even if the jury believed that the he was at the AutoZone prior to the burglary.  *See* Davis v. Alaska, 415 U.S. 308, 316 (1974).  There was no objection to the government's questioning regarding distance between the AutoZone and Fifth-Third Bank and counsel was not deficient for failing to object.

> b.  *Improper Vouching for Government Witnesses*

Robinson next alleges that the failure to object when the prosecution vouched for its own witnesses was an instance of deficient representation. [Record No. 152, at 52-54].  Robinson claims that the prosecutor's statement characterizing the investigation of the police officers as "thorough" and "careful . . . would [lead] a reasonable juror to infer that the prosecutor has a special ability or extraneous knowledge to assess 'that the United States's witnesses told the 'whole truth.''[sic]" [Record No. 152, at 53].

In analyzing if a statement by the prosecution constitutes improper vouching, "[t]he threshold determination should be whether counsel's comments can be reasonably construed to be based on personal belief."  United States v. Bess, 593 F.2d 749, 756 (6th Cir. 1979).  Further, in closing a prosecutor "may state conclusions drawn from the evidence." United States v. Ratliff, 346 Fed.Appx. 473, 476 (6th Cir. 2009) (citations omitted). When viewed in context, the statement made by the government can only be construed as a proper inference based on the testimony from law enforcement officers, not a statement of the AUSA's personal belief.  The prosecutor encouraged the jury to conclude from the evidence presented that the investigation had been conducted in a meticulous and prudent manner.  The prosecution was not vouching for the government's witnesses, but instead urging the jury, in light of the testimony that had been offered, to conclude that the officers had conducted a "thorough" and "careful" investigation.

Therefore, no colorable objection existed to the statement by the government characterizing the investigation as careful and thorough and the failure to object was not deficient representation.

   c.   *Failure to Object to Improper Cross-Examination and Closing Remarks about Witness Credibility*

   Robinson's next claims of deficient representation relate to counsel's failure to object when the prosecution improperly questioned him about other witnesses' credibility, forcing him to comment on whether the government's witnesses were lying. [Record No. 152, at 54-55]. Further, the resulting testimony was improperly used by the prosecution in closing argument. [Record No. 152, at 55-56].

   Almost all circuits have followed the Second Circuit in holding that "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper."  United States v. Richter, 826 F.2d 206, 208 (2nd Cir. 1987) (citations omitted); *see also, e.g.*, United States v. Harris, 471 F.3d 507, 511 (3rd Cir. 2006); United States v. Thomas, 453 F.3d 838, 846 (7th Cir. 2006); United States v. Williams, 343 F.3d 423, 438 (5th Cir. 2003); United States v. Sanchez, 176 F.3d 1214, 1219-20 (9th Cir. 1999); United States v. Sullivan, 85 F.3d 743, 749 (1st Cir. 1996).  However, the Sixth Circuit has yet to address the issue directly, as the issue has only been raised under a plain error standard and each time the claimed error failed to meet the deferential standard. *See* United States v. Dickens, 438 Fed.Appx. 364, 369-372 (6th Cir. 2011); Arnold v. Wilder, 657 F.3d 353, 367-68 (6th Cir. 2011); United States v. Washington, No. 94-5914, 1995 U.S. App. LEXIS 18091, at *9-11 (6th Cir. July 10, 1995); United States v. Bustos, Nos. 93-1203 & 93-1204, 1994 U.S. App. LEXIS 2702, at *13-15 (6th Cir. Feb. 15, 1994).  However, in both the United States v. Dickens and Arnold v. Wilder, the Court implied that it still applied the rule in Richter without formally adopting it, as in both cases the Court found error with the prosecution's questioning but held

19

that it was either harmless or not plain error. <u>Dickens</u>, 438 Fed.Appx. at 370-72 ("Our circuit has not directly addressed the propriety of asking a defendant whether other witnesses are lying. Although there may be exceptions, the general principle that credibility determinations are meant for the jury, not witnesses, applies here, and the prosecutor's questions were improper." (footnote omitted) (quoted in <u>Arnold</u>, 657 F.3d at 367-68)).

In the case at bar, the prosecutor did not directly ask Robinson whether the government's witnesses were lying.  Instead Robinson was questioned whether the law enforcement officers had a motivation or reason to lie.[1]  This presents a different issue than questioning about whether another witness is lying; here the issue is whether asking if another witness has a motivation to lie is improper. The D.C. Court of Appeals' decision in <u>United States v. Boyd</u> offers the most informative guidance on this issue. 54 F.3d 868 (D.C. Cir. 1995).  In <u>Boyd</u>, the prosecutor asked the defendant whether he had ever met the law enforcement agents testifying in the case, and concluded the line of questioning by asking why the officers would put their lives and careers on the line to get a defendant they did not know.  <u>Id.</u> at 870.  The Court equated the line of questioning to asking directly whether the officers had lied:

> It is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand. . . . The prosecutor here did just that.  Had she merely asked about [the defendant's] previous contacts with the officers, allowing the jurors to draw their own conclusions regarding the witnesses' credibility, her examination would have been unobjectionable.  *She erred, however, in asking [the defendant] point-blank why the police witnesses would "make up" a story about [the defendant].*

<u>Id.</u> at 871 (emphasis added) (citations and footnote omitted).  By asking the defendant whether the officers had a reason to lie, the prosecutor's question operated to take the determination of

---

[1] The two complained of questions asked by the prosecution were: 1. "Two discrepancies we have between what you've testified to and what the officers testified to.  There is no reason why these officers would come in here and lie, is there?"; and 2. "Let's talk about you, specifically, and these officers.  There's no reason why these officers would come in here and make up these stories about you, someone that they have never met, is there?" [Record No. 92, at 354.6-9 & 354.13-16].

witness credibility away from the jury in the same way as directly asking whether the witness had lied.  The underlying assumption in such a question is that the defendant is accusing the government's witnesses of lying; otherwise a motivation to lie would be irrelevant.

The Third Circuit explained the inherent danger in questioning a witness about the veracity of another:

> Such questions invade the province of the jury and force a witness to testify as to something he cannot know, i.e., whether another is intentionally seeking to mislead the tribunal.  In addition . . . such questions force defendants into choosing to either undermine their own testimony or essentially accuse another witness of being a liar.

United States v. Harris, 471 F.3d 507, 511 (3rd Cir. 2006).  The same concern is implicit in questions about another witness' motivation to lie.  The reality of such concern was highlighted during the prosecution's closing argument, as the purpose of posing the questions to Robinson became apparent:

> And as we're talking about the *credibility of witnesses and who to believe and who not to believe*, one thing that the defendant said, I think, yesterday, was very telling.  The last question I asked him.  Even the defendant admitted that there is no reason that he knows of why the witnesses that the United States presented in this case would come in here and lie about him.  That's very telling.

[Record No. 93, at 393.2-8 (emphasis added)].  Obviously, the point of posing the questions was to undermine Robinson's credibility by forcing him to comment on the veracity of the officers' testimony.  Her goal was to compel Robinson to make the identical impermissible choice of Dickens, Harris, and Richter: "either undermine [his] own testimony or essentially accuse another witness of being a liar." Harris, 471 F.3d at 511. Therefore, in line with Boyd, the prosecution's cross-examination of Robinson concerning law enforcement's motivation to lie was the equivalent of asking him whether they had lied.  Accordingly, the questions were improper and warranted objection by defense counsel.  Additionally, considering the preceding

21

analysis, the above referenced remarks in closing also gave rise to a colorable objection that was forgone by Alerding. *See* United States v. Richter, 826 F.2d 206, 209 (2nd Cir. 1987) ("Moreover, prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." (citations omitted)).

Alerding's failure to object was an instance of deficient assistance of counsel. While the Sixth Circuit has never expressly adopted the holding in Richter, it is clear that the Court has adopted its general principal that asking a witness whether another is lying is an improper intrusion on the province of the jury. Dickens, 438 Fed.Appx. at 370-72. Further, "despite their disapproval, courts of appeals generally have not reversed a conviction solely because such questions were posed *unless opposing counsel specifically objected to them*." United States v. Harris, 471 F.3d 507, 511 (3rd Cir. 2006) (emphasis added). In line with the Sixth Circuit predecessors on this issue, the lack of objection would have subjected Robinson's claim of error to the same deferential plain error standard that has allowed the Sixth Circuit to avoid an express endorsement of Richter. Additionally, the justification for not allowing this type of questioning is the disastrous havoc it wreaks on the credibility of the defendant. By failing to object, Alerding allowed Robinson's credibility to be improperly undermined without justification. In this context, where "the entire case turned on whether the jury believed the government or Defendant's version of events," the decision not to object could not be considered part of a reasonable trial strategy. United States v. Robinson, 357 Fed.Appx. 677, 692 (6th Cir. 2009) (Clay, J. dissenting). Therefore, failing to object to the prosecution's questioning of Robinson about the law enforcement agents' credibility and remarks about his improperly induced responses in closing was objectively unreasonable.

As Alerding's failure to object to the prosecution's questioning of Robinson about the veracity of the law enforcement witnesses was found to be deficient representation, it must be addressed whether this error prejudiced Robinson.  While the failure to object may have caused damage to Robinson's credibility, Robinson's own testimony suggested the officers were being untruthful. Especially significant is Robinson's following statement on direct: "Well, I heard what the police officer said earlier about the dog.  Said that the dog took me down and stuff.  The dog didn't.  And I really want to show them the bite so they can see it didn't happen that way." [Record No. 92, at 324.21-24].  Robinson's direct testimony, before the government's improper questioning, impliedly accused the law enforcement witnesses of lying. Accordingly, Robinson's credibility was already suspect due to his own insinuations that law enforcement was untruthful. Therefore, the questioning by the government did not prejudice Robinson so as to merit any significant doubt of the jury's verdict.   Accordingly, Robinson has not shown that Alerding's failure to object to the questioning resulted in a reasonable probability that the jury would have reached a different outcome.

> d.  *Failure to Object to Prosecution's References to Robinson's Invocation of his Right to Remain Silent*

It is clear under federal law that mere reference to a defendant's post-Miranda invocation of his right to remain silent by the prosecution is improper. *See, e.g.,* Greer v. Miller, 483 U.S. 756, 763-66 (1987); Doyle v. Ohio, 426 U.S. 610, 616-20 (1976).  However, such references alone, absent exploitation or extensive commentary by the prosecution, are not enough to reverse a conviction if the references are found to be harmless. United States v. Forrest, 402 F.3d 678, 686 (6th Cir. 2005); United States v. Robinson, 357 Fed.Appx. 677, 683 (6th Cir. 2009).

In this case, the Sixth Circuit has already found the references to Robinson's silence to be non-reversible under the plain error standard.[2] Robinson, 357 Fed.Appx. at 683.  However, this Court is asked to address a separate issue from whether the prosecutor's conduct constituted a reversible error.  Instead, this Court is posed with the question of whether the defense attorney's failure to object based on Doyle was objectively unreasonable.  Accordingly, Robinson is not relitigating the issue of prosecutorial misconduct raised on direct appeal as alleged by the Government. [Record No. 133, at 9].  Robinson's petition does not seek to overturn his verdict based on the prosecution's violation of Doyle.  Instead, Robinson argues that the failure to object to these obvious violations constituted ineffective assistance of counsel. [Record No. 152, at 51-52 & 58-59].

Robinson's trial counsel attested to his experience in his affidavit as including "40 plus years of practice" and having appeared in "over 40 Federal Court Trials." [Record No. 133 app.1, at ¶¶ 6 & 8]. As an experienced member of the federal criminal bar, Alerding should have been well aware of the rule in Doyle, including how it is violated and the consequences of its violation.  This would include awareness that any reference by a prosecutor to a defendant's invocation of his right to remain silent, at a minimum, would be an attempt "to violate the rule of Doyle by asking an improper question in front of the jury."  Greer v. Miller, 483 U.S. 756, 765 (1987).  Therefore, the Court must determine if there were colorable grounds under Doyle for an objection and if failing to object was objectively unreasonable on the part of Alerding.

The following exchange between the AUSA and Lieutenant Gilpin is the first complained of Doyle violation:

---

[2] Because there were no objections to the testimony of Lieutenant Gilpin and Detective Aylor in issue, the error was not preserved for review on direct appeal.  Accordingly, the Sixth Circuit only reviewed Robinson's claim under Doyle for plain error, instead of *de novo*.  United States v. Robinson, 357 Fed.Appx. 677, 683 (6th Cir. 2009) ("Again, Robinson did not object to the testimony; the error is remediable only if the plain error standard is met.").

[AUSA Leonhard] Q. Okay.  Once the subject; that is, the defendant [Robinson], came to the Erlanger Police Department, what happened next?

[Lieutenant Gilpin] A. He was put in an interview room, and I went in and started the interview process with him at that time.  It was approximately 6:15, somewhere in that area in the morning.

Q. So what happened when you attempted to interview him?

A. The first thing I did, since he was in custody, I wanted to make sure he was aware of what his rights were, commonly referred to as Miranda rights.  I set a form in front of him with the explanation of rights. . . . The first one states I have a right to remain silent.  Once I read that to him, I asked if he understood that.  He acknowledged that he did, and basically he said he did not want to talk.  At that point, I terminated reading him his rights, put my initials behind the first one to show that I did read that first sentence to him.  And after that, the interview was terminated. . . .

Q. Okay.  What did you do next?

A. A little bit after 8:00 that morning, Detective Aylor was back at the office. . . . So I thought Detective Aylor and I would approach him, try to interview him again. . . . [We s]et another waiver in front of him. . . . Read him the first one again that he had the right to remain silent.  He basically stated he did not want to talk. . . .

Q. Did the defendant make any statements during either one of those interviews?

A. No.

[Record No. 92, at 185.22-187.10]   Additionally, on direct examination of the next witness for

the government, AUSA engaged in the following line of questioning:

[AUSA Leonhard] Q. Why did you meet with [Lieutenant Gilpin]?

[Detective Aylor] A. I met with Lieutenant Gilpin to discuss where we were at as far as because he was at the other crime scene area with the vehicle and the suspect himself.  We initially tried to talk to Mr. Robinson.  And then I proceeded to fill out applications for an affidavit for a search warrant.

Q. So did you and Lieutenant Gilpin attempt to interview the defendant?

A. Yes, ma'am, that's correct.

Q. Do you remember approximately what time that occurred?

25

A. It was about quarter after 8:00 that morning when we went in to speak with Mr. Robinson.

Q. Did he make any statements to you?

A. No, ma'am.  He refused to speak to us.

Q. What did you do after you attempted to interview the defendant?

[Record No. 92, at 228.21-229.11].   From these exchanges, it is clear that the AUSA elicited testimony about Robinson's invocation of his right to remain silent not once, but twice.  What is also obvious from the questions posed by the prosecution is that they informed the jury that Robinson refused to make a statement.  An objection by Alerding would have been proper and may have ended the line of questioning under Doyle.

As there was a basis for an objection under Doyle, it now must be determined if counsel's failure to object might be considered "sound trial strategy." Michel v. Louisiana, 350 U.S. 91, 101 (1955).  While "post-arrest silence is insolubly ambiguous", Doyle v. Ohio, 426 U.S. 610, 617 (1976),

> [n]ot only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a *significant potential for prejudice*. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted.  And permitting the defendant to explain the reasons for his silence is unlikely to overcome *the strong negative inference that the jury is likely to draw* from the fact that the defendant remained silent at the time of his arrest.

United States v. Hale, 422 U.S. 171, 180 (1975) (emphasis added) (footnote omitted).  Counsel may not have originally objected to Lieutenant Gilpin's testimony about the sequence of events at the police station in an attempt to not draw the jury's attention to Robinson's silence. However, the subsequent questioning of Lieutenant Gilpin and Detective Aylor made it clear that the AUSA was pointing out Robinson's silence to the jury, rendering any previous attempt to

avoid attention ineffectual.  By failing to object, Alerding allowed the prosecution to engage in a line of questioning that was "not very probative of a defendant's credibility, [and] . . . also ha[d] a significant potential for prejudice." Id.  The testimony of Detective Aylor is particularly significant in rendering defense counsel's performance deficient.  By failing to object to a line of questioning that was an obvious attempt to comment on Robinson's invocation of his right to remain silent, Alerding subjected his client's credibility to a "significant potential for prejudice" without any acceptable trial strategy that this Court can deduce.  Therefore, counsel's failure to object to the testimony about Robinson's post-arrest silence was objectively unreasonable and resulted in deficient representation.

As Alerding's failure to object to the prosecution's references to Robinson's invocation of his right to remain silent was found to be deficient representation, it must be addressed whether this error prejudiced Robinson.  As the Sixth Circuit found that the references themselves were not reversible error, the failure to object alone cannot be considered to have prejudiced Robinson. United States v. Robinson, 357 Fed.Appx. 677, 683 (6th Cir. 2009); Id. at 691 (Merritt, J., concurring) (in his concurrence regarding the government's Doyle violation, Judge Merritt concluded that he had "confidence that the jury would have reached the same result without the prosecutor's deliberate disregard for the law").  Therefore, it cannot be shown that, but for the failure to object, there is a reasonable probability that the outcome of Robinson's trial would have been different.  Accordingly, Robinson was not prejudiced by this error.

### 7.   Failure to Prepare for and Damaging Statements Made in Closing Argument

The Sixth Circuit deferred judgment on the merits of Robinson's ineffective assistance of counsel claim based on his attorney's closing argument for review in post-conviction proceedings. United States v. Robinson, 357 Fed.Appx. 677, 684 (6th Cir. 2009). The Court

suggested that, when viewed in context, the statements made by Robinson's counsel in closing, while ambiguous, did not amount to ineffective assistance of counsel. Id. Now, upon habeas review, this Court must first address whether statements made by counsel during closing arguments were objectively unreasonable or if they fell "within a wide range of reasonable professional assistance." Mason v. Mitchell, 320 F.3d 604, 616-17 (6th Cir. 2003). If the comments are found to be deficient, then it must be considered whether prejudice was the result.

Closing argument highlights the wide range of effective trial strategies and tactics. While the right to effective assistance of counsel continues through closing arguments, "[j]udicial review of a defense attorney's summation is . . . highly deferential- and doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). This deference is extended because of the "broad range of legitimate defense strategy at that stage" and the numerous resulting "tactical decisions" involved in determining how to best represent an individual client. Id.

Counsel often does not have much time to develop a closing argument between the close of evidence and summation. Additionally, in a factually simple case with an experienced litigator little preparation might be needed. Notwithstanding the forgoing, factually and/or legally difficult or complex cases require planning and organization to effectively argue to the jury. Cf. United States v. Cronic, 466 U.S. 648, 666 (1984) ("[T]he gravity of the charge, *the complexity of the case*, and the accessibility of witnesses[] are all matters that may affect what a reasonably competent attorney could be expected to have done under the circumstances . . . ." (emphasis added) (footnotes omitted)).

Closing arguments in Robinson's trial took place the on the morning of the third day. [*See* Record No. 92, at 362.24-363.9]. Alerding made several statements that Robinson now

claims constituted ineffective assistance of counsel.  Despite its short duration, Alerding stated in his affidavit submitted by the government, "[t]he Defendant's case was one of the most difficult factual cases [counsel] has ever dealt with in his 40 plus years of practice." [Record No. 133-1, at ¶ 6].    However, counsel stated twice in his closing that he did not prepare prior to summation and said whatever came to his mind. [Record No. 93, at 395.1-7 & 402.4-7]. In his closing, Alerding did opine, "I hate arguing a case after an overnight recess, because then I get confused." [Record No. 93, at 402.3-4]. Alerding also stated,

> Following that presentation [the government's closing], I think it would be appropriate if I waived the white flag and just go sit down, because what could I possibly say about this case that she hasn't said?  I hope none of you stayed up last night wondering about what the defense lawyer was going to say in his closing argument, because I didn't.  Here's the way I do it.  I stand up, and I start thinking about the evidence, and I say what comes to my mind.  If it's a little disjointed, well, I'm sorry.  Some of you people can follow it, and I hope I make it clear as I do it.

[Record No. 93, pp. 394-95].  Robinson argues that counsel exhibited a complete failure to prepare for closing argument, as evidenced by this introduction into his closing, and made additional damaging statements that were the result of ineffective assistance of counsel. However, for the reasons that follow, the Court finds no deficient representation, and Robinson's claim is without merit.

While it is clear that a complete failure to prepare for trial and argue effectively is a serious error on the part of counsel, such a failure may not prejudice the defendant. *See, e.g.,* Storey v. Vasbinder, 657 F.3d 372, 379 (6th Cir. 2011) (stating that the "failures to prepare for trial and to argue effectively . . . are serious, but they are simply not enough to show prejudice in this case"); Visciotti v. Woodford, 288 F.3d 1097, 1106 (9th Cir. 2002).  However, this case involves a review of counsel's statement that he prepared no statement in advance of summation. The Court cannot end its review with merely acknowledging this statement, but must consider

the substance of the closing in order to determine whether counsel was constitutionally ineffective.  In order to do so, the Court will consider and review Robinson's claim that counsel was ineffective for his comments during closing, especially his likening a criminal defendant telling the truth on the stand to the likelihood of someone surviving jumping from an airplane without a parachute.  The Court must consider the comments within the context in which they were made.

> Alerding stated,
>
>> Now, he told a story of how this thing happened.  It's a hard story to follow, but it's not impossible to believe.  Did you ever hear about sky divers that jump out of planes and their chute doesn't open and they live?  Would you believe that if someone told you, hey, a guy fell out of an airplane, landed on the ground and he didn't die.  That's impossible.
>> How about the lady in Cincinnati, had triplets back-to-back without medication.  Think that happens every day?  No, it happens once every nine million times.  So no matter what someone tells you from the stand, it doesn't have to be a lie just because it's from a defendant.  And it can be true, because other things about Mr. Robinson make sense.

[Record No. 93, pp. 398-99]. In the overall context of his closing, this Court agrees with the Sixth Circuit that, "although counsel's style was unorthodox, his argument could reasonably be construed as urging the jurors: to use their common sense in evaluating the evidence; to accept, despite the strangeness of his client's story, that sometimes fact is stranger than fiction; and to follow the jury instructions requiring the government to prove its case beyond a reasonable doubt." United States v. Robinson, 357 Fed.Appx. 677, 684 (6th Cir. 2009).  Therefore, when viewed in the context of the entire closing, his statement that he did not prepare a statement for closing and his seemingly damaging statements in closing argument did not constitute ineffective assistance of counsel. *See, e.g.*, Yarborough v. Gentry, 540 U.S. 1, 5-11 (2003); Cope v. United States, 272 Fed.Appx. 445, 448-49 (6th Cir. 2008); Campbell v. United States, 364 F.3d 727, 733 (6th Cir. 2004).

Assuming, without finding, that Alerding's failure to prepare for summation was found to be deficient representation, the strength of the government's evidence in the case and the overall competence of the defense renders any failings of closing devoid of prejudice. The failures of Alerding's closing did not create a reasonable probability that the jury would have reached a different outcome. Accordingly, Robinson was not prejudiced by this error.

### B.  THE COMBINED EFFECT OF ERRORS

As it has been concluded that none of counsel's errors caused Robinson prejudice, the instances of deficiency do not individually merit reversal. However, Robinson also claims that, even if not prejudicial individually, the combined effect of all the alleged errors resulted in a trial that was fundamentally unfair. [Record No. 152, at 88-89].  "In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." United States v. Trujillo, 376 F.3d 593, 614 (6th Cir. 2004) (citations omitted); *see also* United States v. Hernandez, 227 F.3d 686, 697 (6th Cir. 2000). However, as the Sixth Circuit admonished on Robinson's direct appeal, "a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990), quoted in United States v. Robinson, 357 Fed.Appx. 677, 689-90 (6th Cir. 2009).  Therefore, when considering whether the claimed errors produced a trial setting that was fundamentally unfair, only those instances of conduct deemed to be deficient can be considered for whether their cumulative effect was prejudicial to Robinson.  Accordingly, only the failures to object to the prosecution's references to Robinson's invocation of silence and to the government's questioning of Robinson about law enforcements' veracity should be considered.

Both instances of deficiency of counsel weigh against Robinson's credibility. However, a review of the entire record shows that, absent the instances of deficiency, Robinson's credibility was likely highly suspect to the jury. The testimony of government witnesses and that of Robinson apart from the deficient occurrences call into serious question the veracity of his testimony. Accordingly, Robinson does not demonstrate that even the cumulative effect of counsel's errors prejudiced him and the outcome of his trial would have been different. The cumulative effect of counsel's errors did not result in a fundamentally unfair trial. Therefore, Robinson was not prejudiced by his counsel's errors and there was no violation of his right to effective assistance of counsel.

## IV. CONCLUSION

For the reasons set forth above, it is RECOMMENDED that Robinson's Motion to Vacate, Set Aside, or Correct Sentence [Record No. 112] be DENIED.

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Report and Recommendation. Specific objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service thereof or further appeal is waived. United States v. Campbell, 261 F.3d 628, 632 (6th Cir. 2001); Thomas v. Ann, 728 F.2d 813, 815 (6th Cir. 1984). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004); Miller V. Currie, 50 F.3d 373, 380 (6th Cir. 1995).

Signed January 7, 2013.



Signed By:
Edward B. Atkins
United States Magistrate Judge