**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 07-74-DLB-EBA**

**UNITED STATES OF AMERICA**                                                           **PLAINTIFF**

**vs.**          **OMNIBUS ORDER ADOPTING IN PART AND REJECTING**
            **IN PART REPORT & RECOMMENDATIONS**

**JOHN A. ROBINSON**                                                                **DEFENDANT**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

## I.  INTRODUCTION

Acting *pro se*, Defendant filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  (Doc. # 112).  In his motion, Defendant argues he was denied effective assistance of counsel based on ten alleged errors by his pretrial and trial counsel: (1) failure to challenge the search and seizure of his vehicle, and his arrest; (2) failure to conduct a reasonable investigation prior to trial; (3) failure to adequately cross-examine the prosecution's witnesses, Officer Steve Dickerson, Deputy Jeff Ruber, and Detective Greg Aylor; (4) failure to object to prosecutorial misconduct, including references to Robinson's invocation of his right to remain silent, improper vouching for Government witnesses, improper cross-examination of Robinson and references to his testimony, and inappropriate testimonial statements made by the prosecutor; (5) failure to admit into evidence a receipt from Auto Zone; (6) failure to pursue admission of evidence of a dog bite over the trial judge's exclusion of such evidence; (7) failure to object to

1

allegedly improperly admitted evidence; (8) deficient closing argument; (9) failure to object to instances of judicial misconduct; and (10) alleged collusion with the prosecution to obtain Robinson's conviction.  Pursuant to the Court's local practice, the motion was referred to a Magistrate Judge for preparation of a report and recommendation.

The matter is presently before the Court primarily upon the Magistrate Judge's Report and Recommendation ("R&R) (Doc. # 159), wherein he recommends that Defendant's motion be denied.  Defendant has filed Objections to the R&R (Doc. # 170) wherein he continues to argue that his trial counsel was ineffective.  Defendant's objections are considered *de novo*.  *United States v. Evans*, 581 F.3d 333, 338 n.4 (6th Cir. 2009) (a district court judge reviews a magistrate judge's factual findings for clear error and reviews his legal conclusions *de novo*).

The United States having filed no response to the Objections, and the time to do so having now expired, the R&R and Objections thereto are now ripe for the Court's review. Upon review, all of Defendant's Objections lack merit, except his objection to counsel's failure to challenge the search of his vehicle.   Thus, Defendant's Objections will be overruled in part and sustained in part, and the R&R will be partially adopted as the Court's opinion.

This matter is also before the Court on the Report and Recommendation (R&R) of the United States Magistrate Judge (Doc. # 169) entered on February 26, 2013, recommending that Defendant's Motion to Amend Rule 41(g) Motion (Doc. # 137) be granted, and his Motion to Return Seized Property and Items, Pursuant to Rule 41 of the Federal Rules of Criminal Procedure (Doc. # 126) be denied.   Defendant has filed Objections to the R&R (Doc. # 172).  The United States having filed no response to the

2

Objections, and the time to do so having now expired, the R&R and Objections thereto are

now ripe for the Court's review.  Upon review, the Court will overrule the Objections and

adopt the R&R as the Court's opinion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The following factual and procedural background is taken from the Sixth Circuit's

opinion affirming Defendant's conviction:

> On September 10, 2007, at about 2:00 a.m., the alarm at the Fifth Third
> Bank located near Erlanger, Kentucky was triggered. When Elsmere Police
> Officer Steve Dickerson arrived at the bank, he observed a person wearing
> dark clothing and white shoes and gloves run into a grassy field behind the
> bank. Dickerson pursued the suspect but lost contact in the darkness as the
> suspect reached the woods next to the field. Dickerson called for assistance
> from a canine unit. Boone County Sheriff Deputy Jeff Ruber responded with
> his police dog. After an hour of searching the woods and area around a
> nearby apartment complex, nothing had been turned up.

At about 3:47 a.m., Erlanger Police Officer Dave Lillich showed up with his German
shepherd police dog, Sombie. Sombie discovered several bags of tools in the knee-high
grass of the grassy field. Among the tools were a drill, screwdrivers, pliers, duct tape,
wooden dowel rods (with hooks taped to the ends), hand-held grinder, extension cord, and
a hydraulic "porta-power" tool.

> At about 4:15 a.m., a resident of the neighboring apartment complex,
> Eugene Harris, advised the police that he had, from his balcony, observed
> a suspicious looking man in the parking lot. Harris said that when he asked
> the man what he was doing, he answered, "this is my car." He then got into
> and drove off in what Harris described as a large dark car-a Ford or a
> Continental. Acting on the tip, Officer Lillich and Deputy Ruber found a black
> Lincoln Continental parked near Harris's condominium. It was unoccupied.
> As Sombie searched around the area, he alerted at a fenced-in trash
> collection area. Lillich ordered anyone inside to come out. As soon as
> Sombie entered the fenced-in area, a man jumped out and took off running.
> With Sombie's help, the officers managed to apprehend the suspect, who
> turned out to be defendant John Robinson.
>
> The officers searched the area where Robinson had been hiding and found
> dark clothing, white gym shoes, tan gloves, a flashlight and a ski mask.
> Inside the Lincoln, owned by Robinson's foster brother, the officers found
> mail bearing Robinson's name, road atlases and maps, a card bearing the

name and number of a locksmith, driving directions to various Fifth Third Bank locations, a bank deposit bag containing seven $100 bills, dowel rods (with fish hooks) and bags (like those found in the grassy field) containing "porta-powers," extension cords, sledgehammers, bolt cutters, pry bar, long rods, hammers, black electrical tape, a stethoscope for tools, and a snake-type device.

Investigation at the bank revealed that the night deposit box lock had been drilled and the plastic or fiberglass covering of the box had been ground or drilled, creating white dust. Duct tape was also found at the night deposit box. After Robinson was arrested and advised of his rights, he declined to make a statement to the police.

Robinson was subsequently charged by indictment in the Eastern District of Kentucky with a single count of attempting to enter a bank with intent to commit a felony, in violation of 18 U.S.C. § 2113(a). Attorney Gary Sergent was appointed to represent Robinson. Robinson moved to suppress evidence found in the Lincoln. The motion was denied and the ruling has not been appealed. On February 7, 2008, the district court granted Robinson's motion to permit withdrawal of counsel, based on "professional differences." Attorney F. Dennis Alerding was appointed. On February 20, Robinson, acting pro se, and observing that Alerding seemed to be too busy to properly prepare for Robinson's upcoming trial date, requested the court consider appointing another attorney. The request was inserted in Robinson's pro se motion for a bill of particulars and discovery. The district court rejected the motions, noting that Robinson was represented by an experienced member of the federal public defender panel, and directed the Clerk to disregard any further pro se submissions by Robinson.

As trial commenced on March 3, Robinson did not renew his request for appointment of new counsel or otherwise express dissatisfaction with Alerding's representation. The jury trial lasted three days. After the prosecution presented proofs consistent with the above summary of the police officers' findings in the vicinity of the Fifth Third Bank on September 10, 2007, defendant Robinson testified, offering an innocent explanation for his presence and unusual behavior in Erlanger.

Robinson testified that he was a resident of Jeffersontown, Kentucky, just outside Louisville. He was the owner of a small trucking company and earned extra money by repairing others' trucks and by buying cars at auction, fixing them and reselling them. This explained his possession of numerous tools.

On the evening of September 9, 2007, Robinson explained, he received a call from a man whose semi-truck had broken down at a rest stop in northern

Kentucky. He agreed to drive there for $50 and charged $50/hour to work on the truck. On the way to the rest stop in a black Lincoln, Robinson dropped off an acquaintance, Hector Gonzales, at an apartment complex in Erlanger (approximately 80 miles northeast of Jeffersontown), which happened to be near a Fifth Third Bank. Gonzales took bags of tools with him, saying he needed a couple of hours. Robinson proceeded to the rest stop, where he found the semitruck and repaired it.

He testified that he also assisted another motorist at the rest stop with her Toyota Celica. In fact, in the early morning hours of September 10, he sought out a nearby auto parts store (a 24-hour AutoZone store) to buy a replacement distributor cap. He produced a receipt showing that the purchase had been made at 1:37 a.m. Robinson believed it was about 3:00 a.m. when he returned to the rest stop and replaced the Toyota distributor cap.

He then returned to Erlanger to pick up Gonzales. As he approached the apartment complex, he noticed police in the adjacent field. Because Gonzales was not waiting where Robinson had dropped him off the previous evening, Robinson parked his car and walked around the parking lot to make himself visible. After a brief exchange with an apartment resident, who asked what he was doing, Robinson got back in his car and began to drive off. He parked again to secure the hood of the car when he realized it was unlatched. As he was about to re-enter the car, Robinson noticed a police officer approaching. Rather than risk a confrontation with the police, Robinson decided to hide behind a fence.

Robinson had an explanation for this rather unusual behavior, too. He testified that he had been pulled over by the police near Louisville at about 3:00 a.m. one morning a few weeks earlier. What began on that occasion as a routine traffic stop became something of a traumatic event. Robinson was ordered to get out of his car and get down on the ground. He was handcuffed and placed in a patrol car for a few minutes before the officers realized he was not the "John Robinson" who was wanted on a warrant for murder in Florida. It was because of this earlier case of mistaken identity that Robinson said he wanted to avoid another encounter with the police.

So, when the officers approached the fenced-in area where he was hiding, he decided to take off and run. He admitted this was "stupid." He ran for a couple of minutes before he was caught and arrested.

On cross-examination, Robinson admitted he had been previously convicted, in 1995, of money laundering, causing transportation of stolen vehicles, and failing to file timely tax returns. He had been sentenced to a prison term of 162 months for these offenses and was still subject to post-release

supervision on September 10, 2007. He further acknowledged that by leaving the Western District of Kentucky and traveling to the rest stop in northern Kentucky without his supervising probation officer's express permission, he had violated a condition of his supervised release. Robinson explained that since the need to drive to northern Kentucky had come up unexpectedly on a Sunday evening, he planned to advise his probation officer the next day.

After about three hours of deliberation, the jury reached its verdict, finding defendant Robinson guilty as charged of attempted bank burglary. Shortly thereafter, Robinson's attorney, Dennis Alerding, was allowed to withdraw and new counsel, Derek Gordon, was appointed. On July 22, 2008, the district court sentenced Robinson to a 72-month term of imprisonment, followed by three years of supervised release.

Shortly after filing his notice of appeal, Robinson sought and obtained substitution of appointed counsel, replacing Gordon with David Mills.

### III.   ANALYSIS OF R&R ON DEFENDANT'S SECTION 2255 MOTION

To secure relief pursuant to 28 U.S.C. § 2255, the petitioner must show "a fundamental defect which inherently results in a complete miscarriage of justice." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).   A petitioner "must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect of influence on the . . . jury's verdict." *Griffin*, 330 F.3d at 736 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Defendant alleges that his attorney provided ineffective assistance of counsel in a number of ways.  Claims of ineffective assistance of counsel are governed by the Supreme Court's well-settled analysis in *Strickland v. Washington*, 466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether  counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  To prevail on an ineffective

6

assistance of counsel claim, a petitioner must satisfy a two-part test.  First, the petitioner must establish that his counsel's performance was deficient, which requires a showing that "counsel's representation fell below an objective standard of reasonableness."  *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688).  Second, the petitioner "must show prejudice by establishing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*

This is a high burden to meet.  As the *Strickland* Court stated, "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.  Reviewing courts are not to assess counsel's performance with the benefit of hindsight, but instead attempt to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id.*  Because of the inherent difficulties in making this evaluation, the Supreme Court instructs reviewing courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.*  Notwithstanding this substantial degree of deference, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case" to establish a claim of ineffective assistance of counsel.  *Id.* at 693.

A.    **Counsel's Alleged Failure to Adequately Litigate Fourth Amendment Claims**

1.    **The Search of Defendant's Vehicle**

Following Defendant's arrest, Detective Greg Aylor of the Erlanger Police Department applied for a search warrant to search Defendant's vehicle.  Aylor's Affidavit

identified the vehicle as a black 1999 Lincoln Continental, and requested a warrant to search the vehicle for "any items related to burglary, or items consistent with past burglaries from banking institutions or other businesses including bank locations, routes to banks, maps and atlases, and other evidence of personal belongings related to John A. Robinson . . . ."  (Doc. # 18-3 at 4).

The Aylor Affidavit then recited the following facts to support probable cause for the search:

> Affiant states that on September 10, 2007 the Erlanger Police arrested John A. Robinson after he attempted to break into a night deposit box at the 5/3 Bank in Erlanger, KY.  Mr. Robinson was using a drill, a grinder and other advanced burglary techniques during this crime.  Mr. Robinson fled the area and was captured by K9 after the incident. Mr. Robinson is suspected in 17 related bank burglaries.  Based on all of the above, the Affiant requests that the search warrant be issued to search the above described vehicle, which is in the custody of the Erlanger Police . . . .

(Id.).  Based on the Aylor Affidavit, a Kenton County District Court judge issued the warrant.

The ensuing search of the Lincoln uncovered numerous pieces of incriminating evidence, including: mail bearing Robinson's name, road atlases and maps, a card bearing the name and number of a locksmith, driving directions to various Fifth Third Bank locations, a bank deposit bag containing seven $100 bills, dowel rods (with fish hooks) and bags (like those found in the grassy field behind the bank) containing "porta-powers," extension cords, sledgehammers, bolt cutters, pry bar, long rods, hammers, black electrical tape, a stethoscope for tools, and a snake-type device.

Defendant argues that his pre-trial attorney, Gary Sergent, was ineffective for failing to challenge the sufficiency of the warrant authorizing the search of his vehicle.  Sergent

pursued an alternative strategy, filing a motion to suppress evidence seized from closed containers within the Lincoln as outside the scope of the warrant.  That motion was denied.

To succeed on his claim of ineffective assistance of counsel, Defendant must prove deficient performance and prejudice.  To establish deficient performance, he must prove that his Fourth Amendment claim has merit.  "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

### a.    The Affidavit lacked a nexus between Defendant and the Lincoln

Defendant contends that his Fourth Amendment claim has merit because the Aylor Affidavit failed to establish any connection between the robbery and the Lincoln.  In determining whether probable cause exists to support issuance of a search warrant, the issuing magistrate's task is "simply to make a practical common sense decision whether, given all the circumstances set forth in the affidavit before him,...there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "There must, in other words, be a nexus between the place to be searched and the evidence sought."  *United States v. Gardiner*, 463 F.3d 445, 470 (6th Cir. 2006) (internal citations omitted); *see also*, *United States v. Williams*, 544 F.3d 683 (6th Cir. 2008) (internal citation and quotation omitted).  It is not enough for the search warrant affidavit to state that "the owner of property is suspected of crime."  *United States v.*

*McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006).

This place-evidence nexus was completely absent from the Aylor Affidavit.  The Affidavit did not tie Defendant to the Lincoln in any way, or explain the Lincoln's significance at all.  It failed to describe where the Lincoln was found, who owned it, or why the police believed that the fruits or instrumentalities of crime would be found inside it.  Given this dearth of information, the issuing magistrate could not even have inferred that evidence of the robbery might be found in the Lincoln.  *Cf. Williams*, 544 F.3d at 688 (holding that issuing magistrates may sometimes "infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence"); Wayne R. LaFave, Search and Seizure § 3.7(d) at 381–84 (3d ed. 1996) (stating that in robbery cases, it is sometimes "proper [for the magistrate] to infer that the criminal would have the fruits of his crime in his residence, vehicle or place of business.") (internal citation and quotation omitted).  Therefore, no probable cause existed to support the instant search warrant.

### b.    The good faith exception does not apply

The Government argues that the search is saved by the good faith exception of *United States v. Leon*,  468 U.S. 897 (1984).  The good faith exception applies if evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  *United States v. Carpernter*, 360 F.3d 591, 595 (6th Cir. 2004).  The good faith inquiry is less demanding than probable cause.  *McPhearson*, 469 F.3d at 526.  It requires "examination of the affidavit for particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions."  *Id.*

The Sixth Circuit has recognized four scenarios in which the good faith exception does not apply: (1) when the affidavit contains a known or reckless falsity; (2) when the

10

magistrate who issued the warrant wholly abandoned his or her role; (3) when the affidavit lacks an indicia of probable cause such that reliance on it is objectively unreasonable; and (4) when the warrant is facially invalid such that it cannot reasonably be presumed valid. *United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir.2006).

Here, the first, third, and fourth scenarios all apply to the Aylor Affidavit.  The first scenario applies because the Affidavit contained known or reckless falsities.  It stated that the police arrested Defendant

> after he attempted to break into a night deposit box at the 5/3 Bank in Erlanger, KY.  Mr. Robinson was using a drill, a grinder and other advanced burglary techniques during this crime.  Mr. Robinson fled the area and was captured by K9 after the incident.

(Doc. # 18-3 at 4).  The Affidavit thus clearly implies that Defendant was caught red-handed robbing the bank, that he was seen using certain tools, and that no questions existed regarding his identity.

This was, of course, not correct.  Officer Steve Dickerson, the first officer to arrive at the bank, witnessed a black male (not identified as Defendant at the time) walking away from the bank.  He did not see this suspect trying to break into the bank, or using any tools.  He then lost track of the suspect after the suspect fled through a nearby field.  It was not until two and a half hours later that police apprehended Defendant in a nearby apartment complex.  The Affidavit completely omits this lengthy search for the suspect.  In light of these facts, Aylor must have either known that his assertions were false and misleading, or acted with reckless disregard as to their truth.

The third and fourth scenarios apply because the Aylor Affidavit is so "bare bones" that it "preclude[s] application of the good faith exception."  *Id.* at 526.  As described above,

the Affidavit failed to establish any nexus between the robbery and the Lincoln.  This lack of a place-evidence nexus distinguishes the instant case from Sixth Circuit cases where a minimal place-evidence nexus justified application of the good faith exception.  *See, e.g.*, *United States v. Frazier*, 423 F.3d at 526, 536–37; *Carpenter*, 360 F.3d at 595–96; *United States v. Van Shutters*, 163 F.3d 331, 337–38 (6th Cir.1998).  The officers' reliance on the search warrant was therefore unreasonable, and the warrant was thus ripe for a motion to suppress.

### c.   Defendant apparently had standing to challenge the search warrant

Defendant's first attorney, Gary Sergent, has submitted a letter to Assistant United States Attorney Elaine Leonhard (Doc. # 133-3), explaining that he opted not to challenge the warrant because his client did not own the Lincoln.  Instead, he decided to file a motion to suppress arguing that the police had exceeded the scope of the warrant.  He claims that this strategy was designed to "avoid a standing argument."

The Magistrate Judge found no error in Sergent's approach.   In his R&R recommending denial of the instant motion, the Magistrate Judge concluded that Defendant did not have standing to challenge the search warrant because there was insufficient evidence that he owned the vehicle.[1]  In his objections to the Magistrate's R&R,

_____

[1]  The Magistrate Judge correctly found insufficient evidence that Defendant owned the Lincoln.  The trial record and the suppression hearing record reveal *no* evidence that Defendant owned it.  Defendant's claim that he bought the vehicle from his brother eleven months before his arrest appears for the first time in his reply in support of the instant Petition (Doc. # 152, at 7).  Thus, even if Defendant informed Sergent that he had purchased the car from his brother, as he claims he did, Sergent could have reasonably concluded this was insufficient to establish standing.  In *United States v. Elmore*, 304 F.3d 557 (6th Cir. 2002), the Sixth Circuit rejected the defendant's claim of standing, where the defendant alleged that he had provided the purchase money for the vehicle in question and he expected the registered owner to transfer title to him soon.  In light of *Elmore*, the Magistrate Judge was correct to reject Defendant's claim of ownership.

Defendant argues that whether he owned the vehicle is irrelevant; what is important, he asserts, is that he possessed the vehicle with the title-holder's permission, and thus had standing to challenge the search.

"It is well-established that a driver of a borrowed vehicle may establish a reasonable expectation of privacy in a vehicle even though that driver is not the owner of the vehicle." *Johnson v. United States*, 604 F.3d 1016, 1020 (7th Cir. 2010); *Cf. United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (unauthorized driver of a rental car had legitimate expectation of privacy in the car because, among other factors, he had permission from the authorized driver); *United States v. Dunson*, 940 F.2d 989, 994-95 (6th Cir. 1991) (passenger in a borrowed vehicle who had borrowed the vehicle together with the driver had a legitimate expectation of privacy in the vehicle).   To establish a reasonable expectation of privacy in a borrowed vehicle, the driver must demonstrate two factors: lawful possession and control.  *Johnson*, 604 F.3d at 1020.   Each inquiry is fact specific. However, as a general matter, lawful possession will be found where the driver was operating the vehicle with the permission of the owner.  *Id.*  Control will be found where the driver had the right to exclude others from the vehicle, and where he had taken normal precautions to maintain his privacy in the vehicle.  *Id.*; *see also*, *United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006) (citing *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

Had Sergent challenged the Aylor Affidavit, Defendant could have argued that he had both possession and control of the Lincoln.  He certainly had exclusive possession: he was the sole known driver on the night of the robbery.  Moreover, he did not abandon the car, but hid from the police no more than 50 feet from the vehicle.  He also had control

13

of the vehicle: he locked it before the police seized it, and he held the only known set of keys (see Doc. # 90 at 27).  He thus took precautions to exclude others.

Whether he possessed the car *lawfully* was not explored at trial or at the suppression hearing.  But Sergent apparently had reason to believe Defendant's possession was lawful.  In his brief supporting his motion to suppress (Doc. # 18-2), Sergent asserted that: "[t]he police were advised that the Defendant had possession of the motor vehicle *with the permission of his brother*."  (Id. at 4) (emphasis added).  Sergent's knowledge at that time is important because in evaluating the reasonableness of his conduct, this Court must attempt to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  If Sergent had reason to believe that Defendant possessed the Lincoln with his brother's permission, he should have concluded that Defendant had standing to attack the search warrant.  His conclusion that Defendant lacked standing was error.

This case is similar to *Johnson v. United States*, 604 F.3d 1016, 1020 (7th Cir. 2010).  In *Johnson*, police found cocaine in defendant's car.  His attorney decided not to file a motion to suppress the cocaine because the defendant did not own the car.  The Seventh Circuit held this was error because, although the issue was not explored at trial, it appeared that the defendant had the permission of one of his relatives to drive the car.  Moreover, he was the sole occupant of the car and there was no evidence that he allowed others general access to it.  The Seventh Circuit held that his attorney's misapprehension of the applicable law constituted deficient performance.  So too here, Sergent's misperception of the correct legal standard rendered his representation deficient.  Thus, the Court will sustain Defendant's objection in part.

14

### d.      Defendant was not prejudiced by counsel's error

Counsel's deficient performance notwithstanding, Defendant was not prejudiced. While the evidence found in the Lincoln was undoubtedly important, the Government's case against Defendant was still very strong without it.   First, Defendant matched the description of the suspect.  Officer Dickerson reported that the bank robber was a black male wearing black clothing, white shoes, white gloves, and possibly something dark over his face.  Defendant, a black male, was later found hiding next to black clothing, white shoes, tan gloves, a black ski mask, and a flashlight.  Second, at trial, Defendant admitted that the tools recovered in the field behind the bank belonged to him.  This was an incredibly damaging admission because these tools were highly consistent with the modus operandi of the robber, who had apparently used similar tools to drill and grind the night deposit box.  Defendant had no good explanation for how his tools ended up in the same field the suspect ran through after committing the robbery.  He claimed that his passenger, "Hector," had taken some of his tools with him when Defendant dropped him off nearby the bank.  However, since Defendant presented no evidence that "Hector" ever really existed, the jury could have easily concluded that Defendant was the one who left the tools in the field behind the bank.

Third, Defendant both hid from and fled from the police.  These actions were strongly indicative of guilt.  What's more, his uncorroborated explanation for them—that he feared the police because he had recently been mistakenly identified as a murderer—could only have further damaged his credibility with the jury.   Fourth, and perhaps most damaging of all was Defendant's own testimony.  His explanation for why he was hiding in a trash collection area in Erlanger, over 80 miles from his home, near the site of a

15

robbery, with a ski-mask and a flashlight, at 4:30 a.m., made no sense whatsoever and was completely uncorroborated.  The Sixth Circuit charitably termed Defendant's version of events "unusual"; in reality, they were almost impossible to believe.  Furthermore, any credibility Defendant may have had after his direct testimony was placed in further doubt when the prosecutor impeached him with several prior felony convictions.  For all these reasons, Defendant has not established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688).  Even without the evidence found inside the Lincoln, there was more than enough incriminating evidence for a jury to convict Defendant.  In view of that evidence, summarized herein, the Court cannot conclude there is a reasonable probability that the result of the trial would have been different in the absence of the evidence seized from the Lincoln.  Having failed to demonstrate prejudice, Defendant's ineffective assistance claim regarding the seizure and search of the Lincoln is denied.

## 2.    Defendant's Arrest

Defendant also argued that his attorneys were ineffective because they failed to challenge his arrest.  Defendant asserted that his arrest was unlawful because, without probable cause, the police blocked his unoccupied car in its parking space.  In the alternative, he asserts that the police seized him without probable cause when they ordered him to come out from his hiding spot in the trash collection area.  The Magistrate Judge found that because he attempted to flee, Defendant was not under arrest until he was actually apprehended.  Defendant objects that the officers had no basis to detain him in the first place, and that they seized him before he attempted to flee.

16

A show of authority does not constitute seizure unless the subject yields to such authority. *California v. Hodari D.,* 499 U.S. 621, 625-29 (1991). Here, Defendant did not yield to authority because he attempted to flee when the officers ordered him to come out from the trash collection area. His claim that he was seized when the officers merely yelled at him to come out is without merit. Like the defendant in *Hodari D*, Defendant fled from police rather than comply with their orders to stop. Defendant's ineffective assistance claim in this regard thus fails. His attorneys were not obligated to challenge his arrest.

**B.    Counsel's alleged failure to conduct an Adequate Pretrial Investigation**

Defendant further argued that his attorney's pretrial investigation was deficient in two respects: (1) he failed to review the transcript of Officer Dickerson's suppression hearing testimony regarding the police perimeter around the apartment complex, and failed to interview Officer Dickerson; and (2) he failed to call Al Tanner, a locksmith, as a witness to refute the government's theory that Tanner had taught Defendant how to break into a night deposit box. In his R&R, the Magistrate Judge reviewed both of Defendant's claims and concluded that his attorney's conduct was reasonable under the circumstances.

First, the Magistrate Judge correctly found that because Officer Dickerson did not testify about the security perimeter on direct, his suppression hearing testimony would have irrelevant if presented on cross examination. Defendant's objection improperly raises a new claim: that his attorney should have called Officer Dickerson as a rebuttal witness to refute misleading questions lodged by the prosecutor during her cross-examination of Defendant. Because Defendant failed to raise this claim in his motion, the Court will not consider it as part of his Objections.

Second, the Magistrate Judge found that calling Al Tanner as a witness was

unnecessary because the Government never argued that Tanner taught Defendant how to break into a night deposit box.  In his Objections, Defendant contends the prosecution implicitly raised the issue by entering into evidence an index card found in Defendant's vehicle with Tanner's name on it, and by eliciting police testimony that the night deposit box had been drilled.  In the Court's view, the introduction of this evidence did not obligate Alerding to call Tanner.  The prosecution never argued that Tanner had tutored Defendant in art of night deposit box drilling.  Alerding's decision not to call Tanner was therefore reasonable.

## C.   Counsel's Alleged Failure to Competently and Adequately Cross-Examine Witnesses

In his motion, Defendant argued that his attorney incompetently and inadequtely cross-examined Officer Dickerson and Detective Aylor.  In his R&R, the Magistrate Judge concluded that despite "isolated instances of questionable phrasing," counsel's cross-examination was meaningful and thorough.  Defendant's objection merely cites to the arguments originally advanced in his motion.  The Court will overrule his objection.  The Magistrate correctly concluded that counsel's cross-examination was proper under the deferential *Strickland* standard.  Defendant's claim is therefore denied.

## D.   Admission of Evidence

Defendant also advanced three claims of ineffective assistance of counsel regarding his attorney's alleged failure to properly introduce evidence.

First, he argued that Alerding failed to lay a proper foundation that would have permitted him to show the jury the dog-bite scars on his back.  Defendant reasoned that showing the jury these scars would have contradicted police testimony about his alleged

18

attempt to flee from law enforcement.   In his R&R, the Magistrate Judge disputed Defendant's contention that the Undersigned disallow this dog-bite evidence due to improper foundation.   The Court agrees with the Magistrate Judge.   The Undersigned disallowed this evidence because the scars were simply not relevant to any matter at issue, and thus would not have been admissible even if counsel had laid a foundation for them. Defendant's objection, which merely restates the argument in his Petition, is overruled.

Second, Defendant argues that his attorney failed to properly admit an AutoZone receipt into evidence.   However, as the Magistrate Judge correctly noted, defense counsel did admit the receipt and it was submitted to the jury during deliberation.   Thus, Defendant's claim fails.

Third, Defendant argues that his attorney failed to object to allegedly unadmitted government documents that were improperly let into the jury room during deliberation, including mail and other papers found in a black satchel in the Lincoln.   However, as the Magistrate Judge correctly noted, these documents *were* admitted into evidence at trial, and thus counsel could not have objected to the documents being allowed in the jury room. This claim thus fails as well.

## E.   Failure to Object to Judicial Misconduct and Counsel's Conflict of Interest

Next, Defendant argued that his attorney should have "objected to the trial judge's mannerisms, moved for a mistrial or requested the Judge to recuse his self." (Doc. # 120-5 at 38).   According to Defendant, at certain times during the trial, the Undersigned's "tone" improperly conveyed hostility toward him in front of the jury.   In his R&R, the Magistrate Judge found this argument to be completely without merit, and the Court concurs. Defendant's objection, which includes no new arguments, is overruled.

19

Defendant also argued in his motion that his attorney demonstrated a conflict of interest because he essentially abandoned his role as defendant's advocate and joined the prosecution.  Defendant lists several examples of this alleged conflict of interest. Most of these examples are recycled arguments from other sections of his motion.  The Magistrate Judge concluded that Defendant's claim lacks merit.  The Court agrees.

## F.   Failure to Object to Prosecutorial Misconduct

Defendant also argued that his attorney should have objected to four instances of prosecutorial misconduct.

### 1.   Alleged Testimonial Statements From the Prosecutor

First, Defendant asserted that during his cross-examination, the Assistant United States Attorney made improper testimonial statements about the distance between the AutoZone and the Fifth-Third Bank.  The complained-of questions are as follows:

> Are you aware, even though you're not from this area, that the Auto Zone you went to is not that far of a distance from the Fifth Third Bank on Dixie Highway in Erlanger, Kentucky?"

> If I were to tell you I'm from this area, and it's not so far, would you have any reason to dispute that?

(Doc. # 92, at 209).

The Court agrees with the Magistrate Judge's finding that these statements were not testimonial, and were proper subjects of cross-examination.  Defendant's objection is overruled.

### 2.   Improper Vouching for Government Witnesses

Second, Defendant contended that the prosecution vouched for its own witnesses. During closing argument, the AUSA told the jurors that the police officers "were thorough,

and they were careful." (Doc. # 93 at 392-93). The Magistrate Judge found that this statement did not constitute vouching because it was not an expression of her personal belief; rather, it was an argument meant to urge the jury to conclude that the officers had performed their duties with due care and attention. The Court agrees. The prosecutor's statement cannot be "reasonably construed to be based on personal belief." *See United States v. Bess*, 593 F.2d 749, 756 (6th Cir. 1979). The Court will therefore overrule Defendant's objection, in which he reiterates that his attorney should have objected to the alleged improper vouching.

### 3.     Compelling Defendant to Comment on Other Witnesses' Credibility

Third, Defendant argued that the prosecutor improperly questioned him about other witnesses' credibility, thereby compelling him to comment on whether he believed the Government's witnesses were lying. The prosecutor posed the following two questions to Defendant during cross-examination:

> Q. . . . Let's talk about how you were apprehended and the fact that the perimeter was or was not secure. Two discrepancies we have between what you've testified to and what the officers testified to. There is no reason why these officers would come in here and lie, is there?
>
> A. Well, you know, I can't -- people do a lot of things. Look how many people's been sent to prison and DNA found out that was innocent. Look at all that. I mean, somebody --
>
> Q. Let's talk about you, specifically, and these officers. There's no reason why these officers would come in here and make up these stories about you, someone that they have never met, is there?
>
> A. No, but like I told you before, I don't recall their testimony exactly like you said.

(Doc. # 92 at 224).

In closing argument, the prosecutor also commented on Defendant's answers to

these questions:

> And as we're talking about the credibility of witnesses and who to believe and who not to believe, one thing that the defendant said, I think, yesterday, was very telling. The last question I asked him. *Even the defendant admitted that there is no reason that he knows of why the witnesses that the United States presented in this case would come in here and lie about him*. That's very telling. I think the evidence showed that law enforcement in this case, there were at least three different law enforcement agencies on scene. Elsmere, Erlanger, Boone County. A number of police officers, and you heard from several of them. They were thorough, and they were careful.

(Doc. # 93 at 26) (emphasis added).

"Prosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987) (citations omitted); *United States v. Dickens*, 438 F. App'x. 364, 369-72 (6th Cir. 2011) (applying the general principle set forth in *Richter* without formally adopting it).  Here, the AUSA did not directly ask Defendant whether the police officers were lying, but her questions effectively compelled Defendant to comment on the veracity of the officers' testimony.  *See United Stats v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995) (finding that the prosecutor erred by "asking [the defendant] point-blank why the police witnesses would 'make up' a story about [the defendant].") (citation and footnote omitted). Because the law clearly forbids such questions, the Magistrate Judge found that defense counsel's failure to object to these questions was objectively unreasonable and constituted deficient performance.  The Court agrees.

Whether Defendant was prejudiced by this deficient performance is separate question.  Prejudice exists where an attorney's error "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process."  *Greer*, 483 U.S. at 765. "When evaluating prejudice to the defendant, a reviewing court must [take] into account

the totality of the circumstances, as well as the relative strength of the case proffered by the prosecution...." *Foster v. Wolfenbarger*, 687 F.3d 702, 709 (6th Cir. 2012) (internal citation and quotation omitted).

To establish prejudice, Defendant relies on the Second Circuit's opinion in *Richter*. In *Richter*, the prosecutor asked the defendant repeatedly whether he thought another witness "was either mistaken or lying." 826 F.2d at 208. The prosecutor then called a rebuttal witness to corroborate the first witness's testimony. He concluded by using the discrepancies in testimony as a core theme of his summation, and even deliberately misquoted the defendant's testimony:

> [I]f you find that the FBI agents are telling the truth, then Mr. Richter is guilty and his guilt has been established . . .
>
> Members of the Jury, there is another compelling reason why Mr. Richter's testimony on that stand is unworthy of your belief, and that is because it's completely inconsistent with his direct testimony on not one but two FBI agents.
>
> You heard Mr. Richter on the witness stand. I asked him time and time again, isn't it a fact, sir, isn't it a fact that you admitted to the FBI that when Mr. Von Braunsberg gave you these checks he told you that he had taken them from the bank, and he said No, I never said that to them. Then they are mistaken or lying. Over and over again, the agents are lying to get me. That's what Mr. Richter wants you to believe. And ask yourselves why. Why would two agents of the FBI, with some 30 to 40 years of experience between them, come into this courtroom and commit perjury and risk their careers to get Mr. James Richter? Why would they do that?
>
> * * *
>
> So, members of the Jury, I submit that you can determine that Mr. Richter is not telling you the truth because if he is, then these two agents, over and over again, in this courtroom, committed perjury.
>
> Over and over again, the agents are lying to get me. That's what Mr. Richter wants you to believe.

*Id.* at 209.

The Second Circuit held that the prosecutor's conduct amounted to reversible error. What the court found most egregious was not the prosecutor's cross-examination of the defendant, but his exploitation of the defendant's answers to call a rebuttal witness, his extensive use of the discrepancies in testimony during closing argument, and his deliberate misquoting of the defendant's testimony.

The AUSA's misconduct in the instant case pales in comparison to the misconduct in *Richter*. First, unlike the prosecutor in *Richter*, who repeatedly forced the defendant to comment on another witness's veracity, the AUSA here only asked Defendant two questions about the police officers' veracity. Moreover, those questions were not extensive. She asked them and then moved on without belaboring the point. Second, she did not make these questions the core theme of her cross-examination, as the prosecutor did in *Richter*. Third, those two questions did not concern the central narrative of Defendant's testimony—that he was in Erlanger on September 10, 2007 between 2:00 and 4:30 a.m. not to rob the bank, but to repair a total stranger's vehicle. Rather, they focused on less significant points about the details of Defendant's flight from the police and the exact configuration of the police perimeter. Fourth, and perhaps most importantly, she did not use Defendant's testimony to call a rebuttal witness—a fact that wholly distinguishes this case from *Richter*.

More broadly, the Sixth Circuit has held that questioning a defendant about another witness's veracity, without more, "rarely constitute[s] plain error." *Dickens*, 438 F. App'x. at 371; *see also*, *United States v. Washington*, 60 F.3d 829, 1995 WL 408128 at *3 (6th Cir. July 10, 1995) (unpublished table decision) (no plain error where prosecutor repeatedly forced the defendant to "characterize the police as either mistaken or lying"); *United States*

24

*v. Bustos*, 16 F.3d 1221, 1994 WL 47785 at *4-5 (6th Cir. Feb. 15, 1994) (unpublished table decision) (no plain error where prosecutor forced the defendant to characterize other witnesses as mistaken); *United States v. Todd*, 431 F. App'x. 412, 2011 WL 2474281, at *3 (6th Cir. June 22, 2011) (unpublished table decision) (no plain error where prosecutor asked the defendant whether other witnesses were lying).  For instance, in *Dickens*, the Sixth Circuit found no prejudice where the prosecutor asked the defendant four times whether another witness was lying.  438 F. App'x at 372.  It held that these questions were "hardly flagrant enough to amount to plain error. Although the questions were asked deliberately, the four instances of improper questioning neither mislead the jury nor prejudiced Dickens. The questions were not 'extensive,' and the evidence against Dickens was strong." *Id.* at 371.

Other courts have likewise refused to find prejudice even when faced with prosecutorial misconduct much more flagrant than the misconduct here.  In *United States v. Harrison*, the Ninth Circuit found the defendant was not prejudiced despite the fact that the prosecutor asked the defendant *at least 26 questions* about the veracity of government witnesses.  585 F.3d 1155, 1159 (9th Cir. 2009).  The *Harrison* Court noted that there was physical evidence of the defendant's guilt, the district court provided a curative instruction, and various witnesses undermined the defendant's credibility.  *Id.*

Another example is *United States v. Ross*,  No. CR S-99-0043 WBS EFB, 2011 WL 1253870 (E.D. Cal. March 30, 2011).  In *Ross*, the prosecutor repeatedly forced the defendant to comment on government witnesses' truthfulness, and used his closing argument to exploit the defendant's answers and improperly vouch for government witnesses' veracity.  *Id.* at *13-15.  His closing is worth quoting at length:

[T]he defendant has tried to combat [the proof against him] by telling you that virtually everybody who has testified against him has come into court, taken the oath, sat on that witness stand, and lied to you.

He directly called Detective Benevides a liar. He used those words. I don't believe he used those exact words for the others, but it was very clear that he was calling Peyton Schur a liar, Richard Vincent a liar, Derrick Williams lied . . .

In essence, if you take everything the defendant has said and not just look at a witness by witness, he's actually claiming that either these individuals have each made an individual decision to all do the same thing, and that is come into court and lie to you, or that they've gotten together and done it collectively, and that there is this vast conspiracy involving a half a dozen people to lie just to get him, Thomas Ross. But what makes it so galling is that this is a conspiracy to get or to frame an innocent man.

Now, the defendant wants you to believe that despite their concern, despite their effort, despite the expense they incurred, they didn't care about getting the right people. They wanted him. For what reason? I don't know. We never heard it. But they wanted him. The person who was actually doing it may have been working right next to Mr. Ross, but they didn't care. They wanted him. And I would submit to you that that is ridiculous.

If you believe the defendant for one second, then you have to automatically believe that each and every one of these witnesses who came into court lied and perjured themselves to you under oath. There is not a way in this world that you can accept the defendant's story unless you find that all of these people have lied. And they not only lied, they lied under oath. If these men are telling the truth, then there's no way the defendant could be.
Mr. Ross wants you to believe him, wants you to believe that these men have, again, either individually all made the same decision to get him or have gotten together and conspired to get him by committing perjury.

It is easy to criticize someone's credibility. It is easy to even refer to them as coining shenanigans or calling him clowns. That's not hard to do. What's much harder is supporting those kinds of accusations after a careful and impartial examination of all the evidence.

And in assessing this case, I would submit to you that it's very easy for Mr. Ross or anyone to come in and state these things never happened, these people are lying.

*Id.* at 12-13.  Despite the prosecutor's extensive questioning, vouching for government

26

witnesses, and lengthy summation on both topics, the United States District Court for the Eastern District of California found that the defendant was not prejudiced under *Strickland* when his attorney failed to object to this misconduct.  The court reasoned that there was significant evidence of the defendant's guilt, and that the case was not "an extremely close case" or "merely a credibility contest."  *Id.* at *16.

Here, the AUSA's misconduct did not approach that of the prosecutors in *Ross*, *Harrison,* or *Dickens.*  She asked fewer and less extensive questions when cross-examining Defendant, and she did not make these questions "an organizational theme for [her] entire cross-examination," as the prosecutor did in *Harrison*.  585 F.3d at 1159. Unlike the prosecutor in *Ross*, she did not focus a major portion of her summation on Defendant's comments regarding government witnesses' veracity, or use her summation to vouch for government witnesses.

In addition, as in *Ross, Harrison*, and *Dickens*, there was significant proof of Defendant's guilt, even without the evidence from the Lincoln, as explained above.  That proof was, in Judge Merritt's words, "overwhelming."  Specifically, there was physical proof tying Defendant to the crime: his own bag of tools found in the field through which the suspect fled after robbing the night deposit box.  What's more, this case was not merely a "credibility contest" or "an extremely close case."  While Defendant's credibility was clearly important, there is not a reasonable probability that the jury would have believed Defendant's testimony were it not for the AUSA's improper questioning.  As noted above, Defendant's version of events were almost impossible to believe.

Given his farfetched testimony and the strength of the government's case against him, the Court finds no prejudice resulted from the AUSA's questioning of him.

27

### 4.        Post-Arrest Silence

Fourth, Defendant argued that the prosecutor improperly referred to his post-arrest silence on two occasions.  The first complained-of exchange took place between the AUSA and Lieutenant Gilpin:

> [AUSA Leonhard] Q. Okay. Once the subject; that is, the defendant [Robinson], came to the Erlanger Police Department, what happened next?
>
> [Lieutenant Gilpin] A. He was put in an interview room, and I went in and started the interview process with him at that time. It was approximately 6:15, somewhere in that area in the morning.
>
> Q. So what happened when you attempted to interview him?
>
> A. The first thing I did, since he was in custody, I wanted to make sure he was aware of what his rights were, commonly referred to as Miranda rights. I set a form in front of him with the explanation of rights. . . . The first one states I have a right to remain silent. Once I read that to him, I asked if he understood that. He acknowledged that he did, and basically he said he did not want to talk. At that point, I terminated reading him his rights, put my initials behind the first one to show that I did read that first sentence to him. And after that, the interview was terminated. . . .
>
> Q. Okay. What did you do next?
>
> A. A little bit after 8:00 that morning, Detective Aylor was back at the office. . . . So I thought Detective Aylor and I would approach him, try to interview him again. . . . [We s]et another waiver in front of him. . . . Read him the first one again that he had the right to remain silent. He basically stated he did not want to talk. . . .
>
> Q. Did the defendant make any statements during either one of those interviews?
>
> A. No.

(Doc. # 92, at 55-57).

The second complained-of exchange transpired between the AUSA and Detective Aylor:

[AUSA Leonhard] Q. Why did you meet with [Lieutenant Gilpin]?

[Detective Aylor] A. I met with Lieutenant Gilpin to discuss where we were at as far as because he was at the other crime scene area with the vehicle and the suspect himself. We initially tried to talk to Mr. Robinson. And then I proceeded to fill out applications for an affidavit for a search warrant.

Q. So did you and Lieutenant Gilpin attempt to interview the defendant?

A. Yes, ma'am, that's correct.

Q. Do you remember approximately what time that occurred?

A. It was about quarter after 8:00 that morning when we went in to speak with Mr. Robinson.

Q. Did he make any statements to you?

A. No, ma'am. He refused to speak to us.

(Doc. # 92, at 98-99).

Under *Doyle v. Ohio*, 426 U.S. 610, 611 (1976), the prosecution's use of a defendant's post-arrest, post-*Miranda* warnings silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment.  In *Doyle*, the defendants testified at trial that they had been framed by an informant.  On cross-examination, the prosecutor asked them several times why they had not shared this story with the police following their arrest.  The Supreme Court held that these questions violated the defendants' due process rights and reversed their convictions.

In *Greer v. Miller*, 483 U.S. 756, 763-64 (1987), the Supreme Court clarified that the mere mention of a defendant's post-arrest silence does not necessarily establish a *Doyle* violation.  In *Greer*, the prosecutor asked the defendant on cross-examination "[w]hy didn't you tell your story to anybody when you got arrested?"  *Id.* at 759.  Defense counsel immediately objected, and the district court sustained the objection and instructed the jury

29

to ignore the question.  The Supreme Court found no *Doyle* violation because "[u]nlike the prosecutor in *Doyle*, the prosecutor in this case was not 'allowed to undertake impeachment on,' or 'permit[ted] . . . to call attention to,' [the defendant's] silence."  *Id.* at 764.

On direct appeal of the instant case, the Sixth Circuit did not explicitly determine whether the AUSA violated *Doyle*.  Instead, it cited *Greer* in finding that no reversible error occurred because the AUSA "did not ask any follow-up questions of the officers, did not use Robinson's silence to impeach him during cross-examination when he told his story at trial, and did not comment on his silence during closing argument."  *Robinson*, 357 F. App'x. at 683.  The Sixth Circuit emphasized that the AUSA "did not exploit the references to Robinson's silence to anticipatorily impeach him, did not even mention his silence in closing argument, and did not take advantage of the ambiguity of his silence to mislead the jury . . . ."  *Robinson*, 357 F. App'x. at 683.  Writing in concurrence, Judge Merritt held that the prosecutor did violate *Doyle*, but that the violation did not require reversal because "the proof is overwhelming" and the conviction was not "at all close or in doubt."  *Id.* at 691.

In his R&R, the Magistrate Judge found that the AUSA's questions were objectionable under *Doyle* and that Alerding should have at least objected to the second question, if not both questions.  His failure to so object constituted deficient performance, the Magistrate Judge concluded.  However, the Magistrate Judge found that defense counsel's deficient performance did not prejudice Defendant.  Relying on the Sixth Circuit's opinion in *Robinson*, the Magistrate Judge held that "[a]s the Sixth Circuit found that the references themselves were not reversible error, the failure to object alone cannot be considered to have prejudiced Robinson."  (Doc. # 159 at 27).

30

The Court agrees with the Magistrate Judge that despite counsel's deficient performance, Defendant was not prejudiced.  Prejudice will be found where the prosecutor's misconduct "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process."  *Greer*, 483 U.S. at 765.  Here, the AUSA did not confront Defendant with his post-arrest silence on cross examination, and she did not mention his silence during her closing argument.  The Supreme Court has clearly held that prejudice does not result where the prosecutor does not exploit the Defendant's post-*Miranda* silence on cross or closing.  *See Greer*.  483 U.S. at 764 (no prejudice where prosecutor refrained from commenting on defendant's post-*Miranda* silence on cross and closing).  The Sixth Circuit has even declined to find prejudice where prosecutors did comment on defendants' post-*Miranda* silence during closing argument.  *See, e.g.*, *Shaieb v. Burghuis*, No. 10–1617, 2012 WL 3893106, at *4-12 (6th Cir. Sept. 7, 2012) (no due process violation where prosecutor elicited testimony from officers about the defendant's post-arrest silence and commented on that silence during closing argument); *United States v. Forest*,  402 F.3d 678, 686 (6th Cir. 2005) (no reversible error where prosecutor commented on defendant's silence during closing argument because the comments were not extensive and did not mislead the jury).  In light of these holdings, the Court cannot conclude that the AUSA's misconduct in the instant case caused prejudice.

This conclusion is bolstered by the fact that the proof against Defendant was more than sufficient to support a conviction, as explained above.  In addition, the fact that there was no curative instruction here, as there was in *Greer*, does not change the Court's analysis.  As the Sixth Circuit has already held, the Court did not have the opportunity to give such an instruction because defense counsel failed to object.  What's more, had the

31

Court given a *sua sponte* instruction, it "might have needlessly brought undue attention to Robinson's post-arrest silence, thereby doing more harm to Robinson's cause than the relatively innocuous answers [given by the officers]."  *Robinson*, 357 F. App'x. at 683.

For all these reasons, Defendant's claim is denied and his objection is overruled.

## G.    Failure to Prepare For and Damaging Statements Made in Closing Argument

In his motion, Defendant argued that Alerding failed to prepare for closing argument, and made damaging admissions during his closing argument.  Alerding stated, in relevant part:

> Now, [Defendant] told a story of how this thing happened. It's a hard story to follow, but it's not impossible to believe. Did you ever hear about sky divers that jump out of planes and their chute doesn't open and they live? Would you believe that if someone told you, hey, a guy fell out of an airplane, landed on the ground and he didn't die. That's impossible. How about the lady in Cincinnati, had triplets back-to-back without medication. Think that happens every day? No, it happens once every nine million times. So no matter what someone tells you from the stand, it doesn't have to be a lie just because it's from a defendant. And it can be true, because other things about Mr. Robinson make sense.

(Doc. # 93 at 31-32).

"Judicial review of a defense attorney's summation is . . . highly deferential- and doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).  The Supreme Court has held that in closing argument, "counsel has wide latitude" and reviewing courts should defer to counsel's tactical decisions given the "broad range of legitimate defense strategy at that stage."  *Id.*  Of course, a complete failure to prepare for trial and argue effectively is a serious failure and may constitute deficient representation.  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011).

32

On direct appeal, the Sixth Circuit deferred judgment on Defendant's challenge to Alerding's closing until post-conviction proceedings.  *Robinson*, 357 F. App'x. at 683-84. The opinion's language, however, suggested that Alerding's closing was unorthodox but not deficient.  When viewed in context, the Sixth Circuit explained, "[Alerding's] argument could reasonably be construed as urging the jurors: to use their common sense in evaluating the evidence; to accept, despite the strangeness of his client's story, that sometimes fact is stranger than fiction; and to follow the jury instructions requiring the government to prove its case beyond a reasonable doubt."  *Id.* at 684.  Drawing on the Sixth Circuit's opinion, the Magistrate Judge found in his R&R that Alerding's comments did not constitute ineffective assistance of counsel when viewed in light of his entire closing.  Defendant objects that the closing was highly damaging because the case turned on his credibility.

Closings similar to Alerding's have been upheld by the Sixth Circuit.  For instance, in *Cope v. United States*, 272 F. App'x. 445 (6th Cir. 2008), the defendant's attorney delivered the following remarks during closing:

> I talked to the prosecutors about this thing on many-this case on many occasions. And I told them, you know, *I'm not going to get a fair trial*, I'm going to get a-strike that. No disrespect to the Court. I'm going to get a trial, but *it's going to be a trial that's so overwrought with prejudice, because of what occurred here, that nobody in their right mind could acquit these people*. I know that. *And they shouldn't be acquitted of some things, perhaps* . . .
>
> There was a shooting around 1-22 of '99. There is virtually no question about it. Did Randy Cope participate in it? Did he aid and abet Terry Cope to do it? There is no proof of that. *Could you convict him? Absolutely*. You folks have the power. You've got much more power than her Honor. You've got much more power than those two U.S. Attorneys there. But you have the power to decide. As Mr. Howe said, you've got the power to vote back there. *Could you convict him of it? There is no question. Did he do it? Probably not*. That

scares me . . .

The offense occurs when you take it to the next level and you actively participate and you do something to kill somebody, as was done in this case, but, however, not to David Bunning.

*Id.* at 448 (emphasis added).

The Sixth Circuit stressed that these comments must be understood in context. The Court surmised that counsel was imploring the jury to give the defendant a fair trial and to exercise their power to acquit an innocent man. His statement that "they shouldn't be acquitted of some things" was likely an acknowledgment of the Defendant's entrapment defense, and thus a strategic argument, not an admission. *Id.* at 449. The Court concluded that counsel's closing was reasonable.

As in *Cope*, this Court finds that Alerding's statements must be viewed in context. The thrust of his summation was that, as the Sixth Circuit phrased it, "sometimes fact is stranger than fiction." Given the improbable nature of Defendant's testimony, it was not unreasonable for Alerding to attempt to salvage his client's case by urging the jury not to reject his client's testimony out of hand. The Court thus agrees with the Magistrate Judge that Alerding's closing was not deficient when examined in context and given the wide latitude counsel has in fashioning a summation.

## H.    The Combined Effect of the Errors

In his motion, Defendant argued that the combined effect of his attorneys' errors caused him prejudice. "In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (citations omitted). Here, those errors include Sergent's failure to

34

challenge the search warrant for the Lincoln, and Alerding's failure to object to the AUSA's questions regarding witness veracity and Defendant's post-*Miranda* silence.   The Magistrate Judge found that the cumulative effect of these errors did not prejudice Defendant because his testimony was already highly suspect to the jury.   The Court agrees.   For the reasons stated above, the Court finds that notwithstanding counsels' errors, Defendant has failed to demonstrate a reasonable probability that the trial would have resulted in a different outcome.

## IV.   ANALYSIS OF R&R ON DEFENDANT'S MOTION FOR RETURN OF PROPERTY

The Magistrate Judge has also prepared a Report and Recommendation (R&R) (Doc. # 169) recommending that Defendant's Motion to Amend Rule 41(g) Motion (Doc. # 137) be granted, and his Motion to Return Seized Property and Items, Pursuant to Rule 41 of the Federal Rules of Criminal Procedure (Doc. # 126) be denied.   Defendant has filed Objections (Doc. # 172) and the United States has not responded to those Objections. The R&R is thus ripe for the Court's review, and the Court now turns to address it.

Defendant filed the instant Motion to Return Seized Property and Items, Pursuant to Rule 41 of the Federal Rules of Criminal Procedure (Doc. # 126), requesting that the Government return property items it seized from him during the underlying criminal proceeding.   The Government advised the Court that it could not locate those items. Following an evidentiary hearing, the Magistrate Judge determined that the items were either lost, or they were returned to Robinson's parents and not properly recorded in the FBI's records.   Either way, the Magistrate Judge found that they are no longer in the FBI's possession.   Defendant sought monetary damages for his lost property.   In the alternative, Defendant moved to amend the instant motion (Doc. # 126) to assert civil claims under the

35

Tucker Act, 28 U.S.C. § 1491, the Little Tucker Act, 28 U.S.C. § 1346, and the Federal Tort Claims Act, 28 U.S.C. §§ 2401, *et seq.* & 2631, *et seq.*  (*See* Doc. # 137, Motion to Amend Rule 41(g) Motion).

The Magistrate Judge correctly found that sovereign immunity bars monetary damage awards under Rule 41(g).  *See McBean v. United States*, 43 F. App'x. 853, 855 (6th Cir. 2002).  However, the Magistrate Judge also rightly found that Defendant should be permitted leave to amend his Rule 41(g) motion (Doc. # 126) to assert civil claims for monetary damages.  *See United States v. Lowdermilk*, No. 1:01–CR–145, 2006 WL 3333018, at *2 (E.D. Tenn. Nov. 15, 2006) (citing *United States v. Dusenbery,* 201 F.3d 763, 768 (6th Cir. 2000) ("A motion pursuant to Rule 41(g) is treated as a civil action in equity when, as here, the owner of the property invokes the Rule after the conclusion of his criminal proceedings.").

The Magistrate Judge went on to conclude that Defendant's FTCA claim does not afford him relief because he failed to file the requisite administrative claim within the FTCA's two year statute of limitations.  The FTCA requires that claimants exhaust their administrative remedies by presenting their claims to the relevant federal agency "within two years after such claim accrues . . . ."  28 U.S.C. § 2401(b).  "[C]laims under the FTCA accrue when the plaintiff has, or with reasonable diligence should have, discovered the facts critical to his or her injury, whichever is earlier."  *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir.1999).  After holding an evidentiary hearing on this matter, and considering the arguments of both Parties, the Magistrate Judge found that Defendant should have discovered that his property was missing in September of 2009 when the FBI returned a collection of property items to his father that did not include the now-missing

36

items.  The Magistrate thus held that Defendant's FTCA claim accrued at that time.  The Court agrees.  Accordingly, Defendant would have had to file a FTCA claim with the FBI by September of 2011.  His failure to do so means that his FTCA claim is time-barred.

Defendant objects that the Magistrate Judge applied an incorrect standard for determining when a FTCA claim accrues.  He contends that pursuant to *United States v. Hall*, 269 F.3d 940, 943 (8th Cir. 2001), a FTCA claim accrues at the moment the government discloses that it has lost, destroyed, or transferred property that would otherwise be subject to a Rule 41(e) order to return.  (Doc. # 172 at 3).  As an initial matter, Defendant misreads *Hall*.  *Hall* did not hold that FTCA claims *only* accrue when the government makes such a disclosure; it held that FTCA claims *may* accrue when the government makes such a disclosure.  *See Hall*, 269 F.3d at 943 (holding that a FTCA claim "*may* accrue . . . when the government discloses that it has lost, destroyed, or transferred property that would otherwise be subject to a Rule 41(e) order to return.") (emphasis added).

More importantly, Defendant's argument is irrelevant because his FTCA claim is barred by sovereign immunity in any event.  The FTCA contains an exception to its waiver of sovereign immunity that applies to "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property by any officer of customs . . . or any other law enforcement officer."  28 U.S.C. § 2680(c); *Adeleke v. United States*, 355 F.3d 144, 151 (2d Cir. 2004).  The Civil Asset Forfeiture Reform Act of 2000 created an exception to § 2680(c), waiving the United States' sovereign immunity when it loses goods or property in its custody for purposes of forfeiture.  *See* § 2680(c)(1) - (4).  But this exception does not apply here because Defendant's property was not "seized for the purpose of forfeiture," as

the exception requires.   *See* § 2680(c)(1).   What's more, there is no exception for government negligence.  The Supreme Court has held that § 2680(c) precludes "*any* claim 'arising out of' [law enforcement officials'] detention of goods," including "a claim resulting from *negligent* handling or storage of detained property."  *Kosak v. United States*, 465 U.S. 848, 854 (1984) (emphasis added).  Defendant's FTCA claim thus falls within § 2680(c) and is barred by sovereign immunity.  His remaining claims under the Tucker Act and the Little Tucker Act also fail to afford him any relief.  The Court will therefore deny his Motion to Return Seized Property and Items, Pursuant to Rule 41 of the Federal Rules of Criminal Procedure (Doc. # 126).

## V.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1) The Report and Recommendation of the United States Magistrate Judge (Doc. # 169) is hereby **ADOPTED** as the findings of fact and conclusions of law of the Court;

(2) Defendant's Motion to Amend Rule 41(g) Motion (Doc. # 137) is hereby **GRANTED**;

(3) Defendant's Motion to Return Seized Property and Items, Pursuant to Rule 41 of the Federal Rules of Criminal Procedure (Doc. # 126) is hereby **DENIED**;

(4) Defendant's Objections (Doc. # 170) to the Magistrate Judge's Report and Recommendation (Doc. # 159) are hereby **SUSTAINED IN PART** and **OVERRULED IN PART**;

(5)     The Magistrate Judge's Report and Recommendation (Doc. # 159) is hereby

**REJECTED IN PART** and **ADOPTED IN PART** as the Findings of Fact and

Conclusions of Law of the Court;

(6)     Defendant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28

U.S.C. § 2255 (Doc. # 112) is hereby **DENIED**;

(7)     This matter is hereby **DISMISSED** and **STRICKEN** from the docket of the

Court; and

(8)     For the reasons set forth herein and in the Magistrate Judge's R&R (Doc. #

159), the Court determines there would be no arguable merit for an appeal

in this matter and, therefore, no certificate of appealability shall issue.

This 3rd day of May, 2013.

**Signed By:**

_**David L. Bunning**_   _DB_

**United States District Judge**

G:\DATA\Opinions\Covington\2007\2-07-74- Order Rejecting in Part and Adopting in Part R&R, and Adopting

Second R&R.wpd